15864

SMITH v. WHETSTONE *ET AL.*

(39 S. E. (2d), 127)

*Messrs. T. P. Taylor,* of Columbia, and *L. Marion Gressette* and *T. M. Houser,* of St. Matthews, for Appellant,

*Messrs. Julian S. Wolfe,* of Orangeburg, and *J. A. Merrit,* of St. Matthews, for Respondents,

August 7, 1946.

MR. ASSOCIATE JUSTICE FISHBURNE delivered the unanimous Opinion of the Court.

J. M. Whetstone, late of Calhoun County, died testate in July, 1944, leaving as his sole heirs-at-law his widow, Sallie F. Whetstone, and six children: Ella Whetstone Smith, Pearl Whetstone Rast, May Whetstone Berry, Ernest W. Whetstone, Dixon Whetstone, and Dreher Whetstone. At the time of his death he was eighty-four years of age. His will was executed March 5, 1943, and a codicil thereto was executed July 2, 1943, both of which were offered for probate by Ella Whetstone Smith, who was therein designated as executrix. A son, Ernest W. Whetstone, was named as executor, but as will hereafter be shown, he appears in this litigation as a contestant and not a proponent of these testaments.

The validity of the will and the codicil was contested by all of the above named sons and one daughter, Mrs. Rast. They contended that their father, the testator, lacked mental capacity to dispose of his property by will, and that both will and codicil were procured through constraint and undue influence exercised over him at the time of their execution by the two daughters, Mrs. Smith and Mrs. Berry, and presumably by his wife and a grandson, Otis H. Smith. The hearing in the probate court resulted in an order admitting the will to probate in due form of law. It was held that the testator possessed the requisite mental capacity and that in its execution no undue influence was exercised over him. With reference to the codicil, the court likewise found that the testator possessed sufficient mental capacity, but held

the codicil to be invalid upon the ground that Mr. Whetstone was unduly influenced in its execution.

Upon appeal, the case was tried *de novo* in the circuit court before Judge Henderson and a jury, and the same result was reached. The judge by a directed verdict, upheld the validity of the will on the issues of mental capacity and undue influence, and also directed a verdict for the executrix as to the codicil on the issue of mental capacity; but refused to direct a verdict as to the codicil on the question of undue influence, thus leaving that as the only issue for the jury. On this issue, the jury rendered a verdict in favor of the contestants, and against the validity of the codicil.

The principal assignment of error is that the verdict of the jury is not justified by the evidence. It is contended by the executrix in this appeal that there was no evidence of undue influence in the case warranting the submission of that question to the jury, and that the court erred in failing to direct a verdict on this issue in favor of the validity of the codicil.

What is and what is not undue influence has been considered and declared in our former decisions, and we need do little more than refer to them here: *Woodward v. James,* 3 Strob., 552 (34 S. C. L., 288), 51 Am. Dec., 649; *Farr v. Thompson,* Cheves, 37 (25 S. C. L., 15); *O'Neall v. Farr,* 1 Rich., 80 (30 S. C. L., 33); *Floyd v. Floyd,* 3 Strob., 44 (34 S. C. L., 23), 49 Am. Dec., 626; *Means v. Means,* 5 Strob., 167 (36 S. C. L., 86); *DuBose v. Kell,* 90 S. C., 196, 71 S. E., 371; Annotation, 31 Am. St. Rep., 670.

In the well-considered case of *Farr v. Thompson, supra,* the court unanimously laid down the law as follows:

"Every person of reasonable mind and sane memory may dispose of his property by will. * * * The true inquiry always is whether there exists the *animus testandi*; for without that, the instrument purporting to be a will is of no ef-

fect in law. The party, therefore, must be free, and under no compulsion from such threat or violence as may reasonably be supposed to move a constant man. Even in cases of such constraint or fear, if when they are over, the testator confirms the will, it is made good. So likewise, wills procured to be made by artful misrepresentations and fraudulent contrivances, are void. But it is not unlawful for a man, by honest intercessions and modest persuasions to procure a will to be made in his behalf. * * *"

And in *Floyd v. Floyd, supra,* it is stated:

"In Williams on Eexecutors, 34, it is said very justly,— 'the influence to vitiate an act must amount to force and coercion, destroying free agency; it must not be the influence of affection and attachment; it must not be the mere desire of gratifying the wishes of another, for that would be a very strong ground in support of a testamentary act; further, there must be proof that the act was obtained by this coercion; by importunity which could not be resisted; that it was done merely for the sake of peace; so that the motive was tantamount to force and fear.' "

From the nature of the case, the evidence of undue influence will be mainly circumstantial. It is not usually exercised openly, in the presence of others, so that it can be directly proved. But the circumstances relied on to show it must be such as, taken together, point unmistakably and convincingly to the fact that the mind of the testator was subjected to that of some other person, so that the will is that of the latter, and not of the former. *Woodward v. James,* 3 Strob., 552 (34 S. C. L., 288). In *Means v. Means, supra,* it is said:

" * * * An allegation of undue influence should be proved, so that the judges of fact, having proper conceptions of what undue influence is, may perceive by whom and in what way it has been exerted. * * *"

The burden of proof rests upon the contestants to establish the existence of undue influence. The general rule is that

when the formal execution of a will is admitted or proved, a *prima facie* case is made out warranting the probate of such will, and the burden of proof is then on the contestant to prove undue influence, incapacity or other objection to the will, and this burden remains on him to the end. *Goethe v. Browning,* 146 S. C., 7, 143 S. E., 362; *Mordecai v. Cantey,* 86 S. C., 470, 68 S. E., 1049; *Anderson v. Wall,* 114 S. C., 275, 103 S. E., 562; *Thames v. Rouse,* 82 S. C., 40, 62 S. E., 254.

As shown by the cases cited hereinabove, in the inquiry as to the sufficiency of evidence to support a charge of undue influence in the procuring of a will, it is not sufficient to condemn and avoid the will to find that there was influence which affected the testator's disposition of his property. In order to vitiate his act, it must be such a degree of influence as dominated his will, took away his free agency, and prevented the exercise of judgment and choice by him. There may have been advice, suggestion or importunity going to affect his purpose and act in the disposition he chooses to make; yet if he had testamentary capacity to dispose of his property; and was free and unconstrained in his volition at the time of making the codicil, the influence that may have inspired it or any of its provisions will not be that influence which the law denounces as undue. For, as was said in *O'Neall v. Farr,* 1 Rich., 80, 30 S. C. L., 33, "Perhaps no man has ever existed who was so entirely self-willed as to be wholly uninfluenced by the opinions and wishes of those with whom he was connected. Not merely in the ordinary affairs of life, but in the disposal of his property, even the sternest man is sometimes influenced by the wishes and advice of a friend, a wife, etc".

That Mr. Whetstone, the testator, was physically infirm and enfeebled by the intermittent illnesses of the aged is conceded throughout the record. He had been living in the town of St. Matthews for years, and the members of his household were his wife, Sallie F. Whetstone, aged eighty-one years, his daughter, Ella Whetstone Smith, the executrix of his

will, and his grandson, Otis H. Smith, Jr. Mrs. Smith had lived with him all of her life, and nursed and cared for him during his declining years. Her son, Otis H. Smith, Jr., was born and reared in testator's home.

Under the will, executed in March, 1943, which has been validated by this litigation, Mr. Whetstone devised to his daughter, Ella Whetstone Smith, his home place farm containing 165 acres, during her life, and after her death to his grandson, Otis H. Smith, for life. Upon the death of the latter, he provided for contingent remainders to the children of Otis H. Smith, upon failure of which the property was devised in equal shares to his three sons, Ernest W. Whetstone, Dixon Whetstone, and Dreher Whetstone, and in case any one of them should then be dead, then to their lawful issue. He devised the remainder of his property, real and personal, to his wife, Sallie F. Whetstone, for life, and upon her death provided that the estate should be divided as follows: The Shell Rock Place, containing 328 acres, to his two sons, Ernest W. Whetstone and Dixon Whetstone, in equal shares, in fee simple; his Houser Place, containing 235 acres, to his son, Dreher, in fee simple. All the rest and residue of his estate was given in equal shares to his three sons and three daughters.

Between the execution of the will, in March, 1943, and the execution of the codicil, in July, 1943, Mr. Whetstone had acquired by devise, real estate and a considerable amount in cash from his brother, W. H. Whetstone. Desiring to make disposition of this after acquired property, he went to the law office of Mr. J. A. Merritt, accompanied by his daughter, Mrs. Berry, in order to execute a codicil to his will. By this codicil he specifically confirmed and ratified his will in every respect and recited therein that he was making the codicil in order to dispose of the real estate and cash devised to him by his brother.

Mr. Merritt, an attorney of unquestioned integrity, was the executor of the will of Mr. W. H. Whetstone, had been

his attorney, and was thoroughly familiar with his estate and the property which passed under his will. He had known his fellow townsman, Mr. J. M. Whetstone, the testator, for many years, but had never been his attorney. It was explained to him that Mr. L. M. Gressette, who was Mr. Whetstone's regular attorney, was out of town, and for that reason Mr. Merritt was requested to prepare the codicil. According to Mr. Merritt's testimony, he was told by Mr. Whetstone and Mrs. Berry (he thinks the latter did most of the talking) in a few words that Mr. Whetstone wished to give a life estate in the real property and the cash derived from the estate of W. H. Whetstone, to Sallie F. Whetstone, his wife; and upon her death the real estate to be given to the grandson, Otis H. Smith, for life, followed by entailments, and the cash remaining to be equally divided between Mrs. Smith and Mrs. Berry. Mr. Merritt thought these provisions were unusual, and suggested that Mr. Whetstone take the draft of the codicil home with him and think it over.

The testator returned to the office next morning alone and stated to Mr. Merritt "that they" did not want it entailed to Mike (Otis), or words to that effect. The codicil was then redrafted in the form it was executed, and, as redrawn, the attorney asked the testator if that was what he wanted, and he replied "that is what I want". Mr. Whetstone took the paper home with him a second time, and upon his return told Mr. Merritt, "that is what they are satisfied with". It was then executed. The attorney testified that there was nothing in the appearance or the actions of Mr. Whetstone, the testator, to indicate or suggest a lack of mental capacity, or that he had been subjected to undue influence. Mrs. Berry did not return to the attorney's office the second time, nor the third time when the codicil was finally executed. It was witnessed by Mr. Merritt, his secretary, and a friend who happened to be passing by the office and was called in. Those who are charged with exercising undue influence, coming within the category of "they", were the members of Mr. Whetstone's household; his wife, his daughter, Ella Whet-

stone Smith, Otis H. Smith, the grandson, and Mrs. Berry, who happened at the time to be visiting the family, but who returned to her home in a neighboring town the day after she accompanied her father at his request to Mr. Merrit's office.

It is on this testimony that the contestants mainly rely, coupled with the physical and mental condition of the testator, to show undue influence.

In 1936 the testator had suffered a serious illness which confined him to his bed about six months. He never recovered his former strength and from that time on had one or two heart attacks and was afflicted with high blood pressure. But, as was his wont, until within a few months of his death, which occurred more than a year after the execution of the codicil, he continued to go up town, and would meet and talk with his friends on the street. He was feeble and infirm, and frequently had to sit down and rest, but there is not a vestige of testimony in the record to show that he was ever irrational. The overwhelming testimony is that he was mentally normal for his years. True, in conversation he would sometimes forget and repeat things, but this trait is not confined exclusively to the aged.

Witness after witness testified, his children included, that the testator, although a little childish in his last years, was a man of determination and moral firmness, and did what he wanted to do. Dr. Fairy, his physician, stated that testator "was a determined man and a man of his own opinion", and "knew absolutely what he was doing". In the opinion of the doctor, his physical condition did not affect his mind, but the majority of people his age suffer from high blood pressure and senile decay. He expressed the opinion that the testator's mental condition for his age was good in 1943. He thought that he could be influenced, but stated as the family physician: "There was nothing to show me that anybody dominated him at all".

Another witness testified that the testator was unable to transact business in a normal way because he was physically feeble. This was a mere expression of opinion, completely disproved by the facts of the case. The evidence shows without contradiction that the testator even after the execution of the codicil in 1943, bought land, and purchased mules independently for the use of tenants on his farm. That after the execution of the codicil he was frequently in the office of Mr. Merritt, executor of his brother, W. H. Whetstone, making constant inquiry as to when he would receive the devise and legacy from his brother's estate; and it was after the execution of the codicil that Mr. Merritt, as such executor, conveyed to him real estate and delivered to him checks approximating $20,000.00.

There was not the slightest evidence showing, as to the execution of the will or the codicil, any secrecy or desire for secrecy. It is true that one or two of the contesting children testified that when they visited their father at his home, other people were always around—presumably their mother, the wife of testator; and their sister, Mrs. Smith, who they said sometimes eavesdropped; and they gave this as the reason why they were unable to talk with him privately. Certainly there could be nothing unusual in the fact that they were greeted in their father's home by his wife, and Mrs. Smith, upon whose shoulders rested practically all the cares of the household, including the nursing and caring for an enfeebled father. But even this, as the testimony shows, did not preclude private conversation,—although they never asked for this privilege. One of the contesting sons stated that after the execution of the codicil, he saw his father several times on the streets of Saint Matthews talking with others; that he did not wish to interrupt the conversation so merely said good morning and passed by.

Another witness, Mr. Wannamaker, who drew wills, deeds, and prepared federal income tax returns, stated that in 1942 and 1943 he prepared income tax returns for the testator; that his daughter, Mrs. Smith, accompanied her father

to his office and furnished most of the data. That the testator needed professional assistance in making out these returns would not necessarily indicate mental weakness; but withal, Mr. Wannamaker said, the testator was in pretty good condition in 1942 and 1943. He stated that upon one occasion Mr. Whetstone suggested that he draw his will, and told him that he wished all of his children to share equally. This was probably in the Spring of 1942 or 1943. The proposed will was never drawn, although Mr. Wannamaker on his own initiative inquired about the matter several times. Finally, the testator told him he would not proceed with it because "I can't get them to agree,"—presumably meaning the same members of his household hereinabove mentioned.

The codicil which is under attack, devised to the testator's wife, who as stated was 81 years of age, a life estate in the tract of land which was devised to him by his brother, W. H. Whetstone, and the income from the cash legacy. Upon the death of his wife, this real estate was devised to his grandson, Otis H. Smith, with no entailment, but in fee simple; and all of the cash which remained after the death of his wife was given to his two daughters, Ella Whetstone Smith and May Whetstone Berry. The three sons and Mrs. Rast were not given any share in the property, real or personal, derived by the testator from his brother.

During the years from 1936 until 1944 when the testator died,—in which time he suffered serious and minor illnesses confining him to bed for many months,—his daughter, Mrs. Smith, nursed him with the help of her aged mother and her sister, Mrs. Berry. Except for one week of this time, no trained nurse was employed, nor at any time were any domestic servants hired. Quite often Mrs. Berry, who lived at Cameron, came to her father's house and stayed for months, assisting her sister and mother in the manifold duties of the household. One time she stayed for a year, and was there continuously during the last three or four months of her father's lifetime. The other daughter, Mrs. Rast, suffered from ill health, and did not see her father very often.

The contesting sons were visitors once a week and sometimes oftener, but rendered no nursing assistance until the last three or four days before their father's death.

The more closely the case is examined in the light of all the testimony, the more clearly it appears that there is no sufficient proof of facts from which undue influence can be inferred. The testator was a man of strongly marked characteristics, of sound mind and determined will, abundantly able to protect himself, which should not be overlooked in a case of this kind. The mere fact that the testator made an unequal, partial or seemingly unjust division of his property is no ground for setting it aside.

It is axiomatic that to make a good will a man must be a free agent, but all influences are not unlawful. It is not enough that there be motive and opportunity, as the evidence undoubtedly tends to show there was in this case, but the influence must be exercised and take effect so as to destroy the free agency of the testator, and control the disposition of the property under the codicil when it is made. Unless the influence of these beneficiaries was unfairly and unlawfully exerted, so as to dominate his will at the time, it is not material that they were interested in the will, or had better opportunities for solicitation or persuasion than the contestants. Nor is it surprising that a testator should favor those who are nearest to him in respect and affection, or by reason of intimate social or domestic relations. *Martin v. Teague*, 2 Speers, 260, 29 S. C. L., 108; *Pressley v. Kemp*, 16 S. C., 334; *Means v. Means*, 5 Strob., 167, 36 S. C. L., 86; *DuBose v. Kell*, 90 S. C., 196, 71 S. E., 371.

The evidence surrounding the execution of the codicil, while it shows that the testator conferred with the members of his household with reference to the particular disposition of the property covered by it, does not show except by innuendo and suspicion, that any undue influence was exercised over him. In his will he had already substantially provided for all of the contestants, except Mrs. Rast. And he

stated as to her his belief that she was "amply provided for in this life".

As was said in *Means v. Means, supra:*

"It is not influence merely, but undue influence, that is always alleged—something excessive and unlawful. It is not the influence of friendship or affection that can be complained of; nor the influence of argument or entreaty, nor the impression made by kindness or prudence, nor even the effect wrought by servile compliance or mean endurance of wrong. It must be something which destroys free agency".

And as was further said in that case:

"The right to make a will is especially valuable to the old and infirm. Their thoughts dwell most upon posthumous arrangements, and in this right they have the means not only of gratifying their feelings, but of securing substantial advantages whilst they live. * * * If the paper has these requisites (mental capacity and volition) no matter how it may disappoint just expectations, how unequal it may be, how it may depart from previous intimations of purpose, it is the testator's will, and the law allows it to prevail. Great mistakes would probably be committed by anyone, who should undertake to decide from previous acquaintance with the aged father of a large family, how he would desire his property to be divided after his death. The modes of thinking in different men as to the relative claims of widows, sons, daughters and grandchildren, and as to the relative values of various kinds of property, are so opposite; the circumstances of children are often so diverse as to family, connexions, property, habits and success,—that apart from differences in character, manners and conduct in the several claimants, and from feelings likely to be concealed in the bosom of the father, allowance would have to be made for many considerations besides equal affection for all, and the special advancements which had been made to each. On the subject of their wills, most men are studiously secret,

and those who speak much seldom speak candidly and consistently."

Furthermore, where the testator has had the unhampered opportunity to revoke his will or codicil subsequent to the operation of an undue influence upon him, but makes no change in it, the court as a general rule considers the effect of the testimony bearing upon undue influence in a large measure destroyed. *Floyd v. Floyd,* 3 Strob., L., 44 (34 S. C. L., 23), 49 Am. Dec., 626; 28 R. C. L., Sec. 106, Page 151. The testator had executed previous wills, in 1936 and in 1941, and later in 1943; he knew that he could alter or revoke the codicil, and the evidence shows that he had many opportunities to effect this purpose if he had wished to do so.

We hold, in the light of the entire record, that the motion for a directed verdict, made by the executrix, on the issue of undue influence in the execution of the codicil, should have been granted.

Judgment reversed.

MR. CHIEF JUSTICE BAKER and MESSRS. ASSOCIATE JUSTICES STUKES, TAYLOR and OXNER concur.