75 So.2d 658

**T. B. HUBBARD, Ex'r,**

v.

**Mary E. MOSELEY.**

**3 Div. 703.**

Supreme Court of Alabama.

Nov. 11, 1954.

684

Capell, Howard & Cobbs, Lawrence J.
Fassman, Jr., Montgomery, for appellee.

Ball & Ball, Montgomery, for appellant.

## PER CURIAM.

This contest of a will was tried with a jury in the circuit court, as provided for in section 63, Title 61, Code. There was a verdict and judgment sustaining the contest and adjudging that the instrument propounded for probate by the plaintiff was not the last will and testament of Mary Green Primus, deceased. The instrument in question was executed by her on June 30, 1953. She died July 16, 1953. She had executed two wills on previous occasions. They related principally to the disposition of her home in the city of Montgomery. Her first will was executed October 31, 1944, when her name was Mary L. Harris Green. At that time, according to the evidence, she was a widow. In that will she named a niece Mary Emanuel Moseley, who resided in Chicago, as the sole beneficiary of her estate. Thereafter she married Isaiah Primus, and on January 16, 1950 she executed another will, at which time of her own accord and without Isaiah, she went to see a lawyer, Mr. Ball, and told him what she wanted. That will provided for the disposition of two rings and devised her home, here involved, to Isaiah for life prohibiting him to mortgage, sell or otherwise encumber his life estate, and upon his death or in the event he should attempt to sell or encumber his life estate it was then given to her alleged niece Mary E. Moseley if living at that time but if not living to her next of kin. She had no other property of much value. On June 30, 1953 she executed the will herein question. In it, besides a diamond ring bequeathed to a named person alleged in the will to be her friend, she bequeathed all her property to her husband (Isaiah Primus) without mentioning Mary E. Moseley. The parties are Negroes.

Mary E. Moseley contested the probate of the will on the grounds of mental incapacity, undue influence exerted by Isaiah Primus, and fraud induced by him. The proceedings do not disclose that decedent had any other heir than Mary E. Moseley. Both the will of 1950 and that of 1953 designated Dr. T. B. Hubbard as executor. Isaiah had been his faithful servant for a great many years. Dr. Hubbard had nothing to do with the making of the will.

The circumstances incident to the preparation and execution of the instrument here in question are thus stated by Mr. Ball who was a witness to the will and the attorney who drew it:

"Gentlemen, it is about the first will that I will make a statement under oath. I am getting out of my capacity as lawyer and climbing into the witness chair. It is necessary as I was a witness to that will.

"The first will that I drew for Mary Primus was the will she signed in my office in 1950, which would be about three years before she made the last will. This will that I will offer in evidence was signed before me and my stenographer, Katherine B. DuBois. We were witnesses and signed as witnesses. This is the will by which she bequeathed two rings to two people. Then she gave the home to her husband, for life, and then after his death, to Mary Moseley, the person who is contesting this will. This will she signed in my office. She came in my office and told me what sort of will she wanted and I drew the will and she came back and signed the will with two witnesses, and took the will off, as I recall, with her. Then three years later her husband called me, shortly before this last will was signed and said his wife wanted to change her will. So I said what does she want to do and he said she wants to leave her niece out, she wants to leave Mary Moseley out, they are not getting along well together and she wants to leave her out. I said can she come to the office. He said she can not, she is old and her sight is about gone, could you help her by coming out and bringing the will and he asked how to handle it and I said I will fix the will, you bring me the old will and I will fix another and bring it out and let her sign it. So he brought in the old will, the 1950 will, and I, with that before me, wrote the new will in which the property she had left Mary

Moseley was left to her husband outright. Now, I was told there was a ring; there were two in the 1950 will, but I was told, one had been delivered and it was only necessary to take care of the one ring and we left out one ring and left the other in. In order to accommodate the old woman and Isaiah, who had been working for my wife's step-father for many years, and is a faithful servant, I said, I will stop by on my way home and let her sign the will. So John Matthews, who rides with me often,—we stopped by late in the afternoon. It was not dark. In July we did not work until dark, we worked—I did not work until dark in July. We rode by there and I think Isaiah was in the front yard and we asked where his wife was and he said sitting on the porch. Mary Green Primus was sitting there in a chair and there was a swing next to her. There was a colored woman sitting there and I think it was somebody who had a room there, probably a teacher or something that had a room there or lived there. I asked Mary Green, Mary do you want to go in the house for me to read the will or do you want to do it out here and she said, out here is all right. I stood by the chair with Mr. Matthews. In fact, *I don't know whether Isaiah was in the yard or not. He was not on the porch where she was. I did not pay any attention to his position. I only know that he had no participation in the thing at all. I read the will to her and carefully explained it to her, and the difference between this will I had brought out and the will she made in 1950, and when I got through reading it to her carefully, I asked was that the kind of will she wanted and she said it was exactly what she wanted. I explained to her that what she was doing was giving the home to her husband and leaving out the niece altogether. I said are you sure that is what you want to do and she said that is exactly what I want to do. She made the comment that her niece had mistreated her,* or something, I did not pay much attention to that. So she signed the will. I had to hold her hand on the place and she signed it 'Mary Primus'. She left out the 'Green'. She said, I made a bad job of it, I have not signed my name fully, and I said, Mary, that is all right, you could put an X there if you want to. She signed 'Mary Primus' with a shaking hand. I said after she signed, Mary, what do you want to do with the will, we keep wills for people in the safe at the office. Do you want to keep it here. She said, I rather keep the will here. So I handed it to John and he signed as a witness and I handed the will to her and left. The next thing I knew, of course, she had died. I would like to offer in evidence a copy of the 1950 will."

There was evidence that Mary Primus, deceased, had suffered a slight stroke a year or so before, that her eyesight was bad, and that her mind was not good on occasion, "would come and go", as some of the witnesses expressed it. Isaiah did not testify to the circumstances inducing him to call Mr. Ball and tell him about preparing the instrument in question. He did say that the house needed repair and he could not get the money to do it unless he had the title to the property.

■ With reference to the burden of proof on the issue of undue influence, the rule in respect to a will (not the same in transactions *inter vivos*), the burden is shifted to the favored beneficiary by evidence of confidential relations when there is proof of undue activity on his part in procuring its execution. When that is proven there is a presumption of undue influence which may be overcome "by proof that the donor had competent independent advice, or by other evidence sufficient to satisfy the judicial conscience that the transaction resulted from the voluntary and well-understood act of the donor." Betz v. Lovell, 197 Ala. 239, 72 So. 500, 501; Mindler v. Crocker, 245 Ala. 578, 18 So.2d 278; Cook v. Morton, 241 Ala. 188, 1 So.2d 890; Scarbrough v. Scarbrough, 185 Ala. 468, 64 So. 105; Jones v. Brooks, 184 Ala. 115, 63 So. 978; Bancroft v. Otis, 91 Ala.

279, 8 So. 286. The term "judicial conscience" means no more than reasonable satisfaction. Coghill v. Kennedy, 119 Ala. 641, 644(17), 24 So. 459.

There are several factors involved in that formula: (1) there must be confidential relations; (2) a favored beneficiary; (3) his undue activity in the preparation or execution of the will; (4) such beneficiary then has the burden of proof, to the reasonable satisfaction of the court or jury trying the issue, that (5) the testatrix had competent independent advice, or other evidence sufficient to show that the transaction resulted from her voluntary and well-understood act.

■ There is no controversy but that confidential relations existed between the parties. As to whether he was a favored beneficiary, it has been said that the test is where he "has been favored over others having equal claim to the testator's bounty. An *unnatural discrimination,* leading to a natural inference that advantage has been taken by one in position so to do", Cook v. Morton, supra, [241 Ala. 188, 1 So.2d 892]; Mindler v. Crocker, supra, and the fact "that a wife (or husband, we may add) has received more under the will than under the dower and homestead laws, and the laws of distribution in case of intestacy", will not raise a presumption of undue influence since such "laws deal with estates not disposed of by will, and proceed on the hypothesis, that the decedent will make a will, if such laws do not dispose of his estate as he desires." Cook v. Morton, supra, 241 Ala. at page 192[7], 1 So.2d at page 892; Mindler v. Crocker, supra.

■ Decedent apparently had no next of kin other than contestant, a niece who lived in Chicago and saw decedent very seldom. She and Isaiah did not have equal claims on testatrix' bounty under the definition given above of a favored beneficiary, sufficient to control the burden of proof. And we think that under the facts of this case the provision for Isaiah was not "an unnatural disposition leading to a natural inference that advantage had been taken by him" in inducing the execution of the

will. Jones v. Brooks, 184 Ala. 115, 63 So. 978. There was no concealment or evasion in respect to its execution, its contents, or its disposition after it was executed. It was read over to testatrix by the attorney whom she had personally selected to write the will of 1950. This was in the presence of a friend who roomed in the home at the time the will was explained to her, and she expressed entire satisfaction with it as correctly explained by the attorney.

■ As we have shown, undue influence will not be presumed except according to a well-defined principle embracing standards which must concur. There was no evidence of undue influence nor of facts from which it may be presumed.

The following charge was refused to plaintiff: "The court charges the jury that if you believe the evidence in this case you should not find for the contestant on the issue of undue influence". It should have been given.

■ Charge No. 10, given for defendant, was erroneous. The test is not whether the disposition of her property contained in the will was *"fairly* made" or whether there was the *interposition* of others. What others? What sort of interposition? It is not so much a matter of fairness as one of "unnatural discrimination leading to a natural inference that advantage has been taken" by Isaiah. The charge is not properly expressed to convey essentials of the principle.

We will not consider the matter of mental incapacity and the charges with respect to it, since the evidence may not be the same on another trial.

■ We will, however, refer to the principle that evidence of prior insanity will not sustain a claim that it continued to the time of executing the will "unless it were also shown that the insanity was habitual and fixed. The burden was on contestants to establish such incapacity before the proponent could be called on to show, that the will was made in a lucid interval." Murphree v. Senn, 107 Ala. 424,

18 So. 264, 266; King v. Aird, 251 Ala. 613, 38 So.2d 883.

The judgment of the circuit court should be reversed and the cause remanded.

The foregoing opinion was prepared by FOSTER, Supernumerary Justice of this Court, while serving on it at the request of the Chief Justice under authority of Title 13, section 32, Code, and was adopted by the Court as its opinion.

Reversed and remanded.

All the Justices concur.