## 21997

James Otto BYRD, as Executor of the Last Will and Testament of Otto Byrd, Appellant, v. Jimmy W. BYRD, Helen B. Posten, Richard E. Byrd, Mildred Patricia James, Pauline Frances Hathaway, Raymond F. Byrd, Nathan E. Byrd, Nellie L. Meadows, Johnny M. Byrd, Elliott C. Byrd, Albert Dean Byrd, and Jackie Lee Byrd, Respondents.

(308 S. E. (2) 788)

*William H. Seals,* of *Law Offices of William H. Seals,* and *Charles T. Speth,* Marion, *for appellant.*

*John C. Lindsay,* Bennettsville, and *Henry Hammer,* Columbia, *for respondents.*

Nov. 2, 1983.

NESS, Justice:

This is a contested will case. Appellant, James Byrd, son of the testator, Otto Byrd, and executor of the will, dated March 25, 1977, appeals from a jury verdict which found affirmatively (1) that the will was the product of undue influence exerted upon the testator, and (2) that the testator did possess sufficient mental capacity to execute the will.

The case was tried *de novo* after respondents, who are the remaining sons and daughters and a son of a predeceased son of the testator, filed a petition requiring proof of the will in solemn form of law.

The primary issue on appeal is whether the evidence was sufficient to submit to the jury the issue of undue influence. We agree with the trial court and affirm.

It is the established law that when the formal execution of a will is admitted — or proved, a prima facie case in favor of the will is made out, and the burden is then on the contestants to prove undue influence, incapacity

or other basis of invalidation. The contestants continue to bear the burden of proof throughout the will contest. In determining whether the contestants sustained this burden, the evidence has to be viewed in the light most favorable to the contestants. *Calhoun v. Calhoun*, 277 S. C. 527, 290 S. E. (2d) 415 (1982); *Havird v. Schissell*, 252 S. C. 404, 166 S. E. (2d) 801 (1969); *Smith v. Whetstone, et al.*, 209 S. C. 78, 39 S. E. (2d) 127 (1946). We have also recognized, by the very nature of the case, the evidence of undue influence will be mainly circumstantial. It is not usually exercised openly so it can be directly proved. However, the circumstances must point unmistakenly and convincingly to the fact that the mind of the testator was subject to that of some other person so the will is that of the latter and not of the former. *Calhoun v. Calhoun*, supra; *Havird v. Schissell*, supra.

With these principles in mind, we review the evidence, which we conclude was sufficient to submit the issue of undue influence to the jury.

Although the jury, by its verdict, found the testator had sufficient mental capacity to execute the will, the evidence establishes the testator was infirm, both mentally and physically, prior to and contemporaneously with the execution of the will on March 25, 1977, and, consequently, particularly susceptible to influence.

In November, 1976, less than one year before his death, the testator was operated on for cancer of the prostate, and his condition deteriorated thereafter, requiring further surgery in July, 1977 to relieve the pain occasioned by his cancerous condition. It was during this period he stayed at his son James' home, which was in close proximity to his own.

Another son, Dr. Albert Dean Byrd, a practicing psychologist, described the changes he observed in his father after he became ill, and during his visit in 1976 upon his father's return from the hospital. In contrast to his previous condition, "he was not very talkative ... disarrayed in his appearance ... just didn't seem to be able to respond." While visiting him during the week of March 12th, he observed that his father "was extremely afraid, he was scared, he seemed depressed on occasions, ... kind of up and down." Dr. Byrd gave his professional opinion that his father was very susceptible to influence during the week before the will was drawn,

and, further stating as to the coercion, "I do not believe he had the will to resist."

There is also evidence that during the period prior to the making of the will, the testator had difficulty recognizing people he had known for a long time, including some of his own children, when they visited him from time to time. There were several incidents recounted where the testator had become lost while driving his automobile in familiar places in the county, and appeared confused to the witnesses who offered him assistance.

Although there was some evidence of his church attendance and a visit to the bank in Marion after the execution of the will, the testimony of Mrs. Norris and James' daughter, Marilyn, clearly shows he did not drive an automobile after March, 1977, and necessarily needed assistance in these activities.[1] During this period, the testator was under heavy medication, including Talwin, a strong pain reliever. Dr. Byrd testified he had Percodan, an opiate analgesic, available to him, which contained aspirin, to which he was allergic, and which made him disoriented. On one occasion, the witness observed, Hattie, James' wife, giving him Valium out of her own bottle, and Hattie told him she gave him that "to calm him down." These circumstances establish susceptibility to undue influence, which, the jury, by its verdict, found was asserted upon him.

Of particular importance on the question of undue influence is the proof of continuing threats made to the testator by the appellant to place him in a nursing home, even though his fear and dislike of nursing homes was well known to his children.

Josephine Norris, his lady friend whom he had visited regularly for a number of years, noted that he was extremely upset on one occasion in March and he told her James had threatened to put him in a nursing home. According to the witness, Mr. Byrd wanted to marry her and live in her home in Gresham for the reason, "he didn't want to go to the nursing home. He always told me he didn't want to go and James was

---

[1] His confused state is further demonstrated by his reference in the will to James' daughter, Mildred Byrd, as the contingent beneficiary, even though James had no daughter named Mildred. His daughter Marilyn, was well known to the testator as "Tut."

threatening to put him in a nursing home." Several of his children also testified to similar statements. This evidence of continuing threats by James to place him in a nursing home gives rise to the strong inference that he was induced and coerced to change his will making James the chief beneficiary, and to so keep it until his death.

There was also evidence of a purpose and design by James and the members of his immediate family to restrict the visits and to prevent communications between the testator and his children prior to and following the date of the execution of the will. Numerous instances were related where the other children of the testator were not permitted to speak to him on the telephone nor to be alone with him when they visited him at home or in the hospital. Several of the sons who lived in Utah testified after March, 1977 and continuing to his death, they were not permitted to speak to their father on the telephone when calls were made to James' home. On these occasions, James' wife, Hattie would answer the phone and offer an excuse, such as, their father was in bad shape or would probably not recognize the party calling. His operation and hospitalization in July, 1977 was concealed from the children of the testator.

It is to be noted that James' wife, Hattie, did not take the witness stand and there was no denial of the testimony of her conduct in restricting James' brothers and sisters from talking with their father or being alone with him.

The testimony of Mildred James, a daughter of the testator, in regard to a conversation with her brother, James, while visiting her father during his hospitalization in July, 1977 evidences an admission of undue influence on his part. At Tr. 57, ff. 20-25.

> "Q. What did he tell you as to why he wasn't accepting your offer to stay there and nurse your daddy?
> A. He said I've got Daddy to change the will and fix it so I can hire nurses and I don't need you any longer.
> Q. James Otto told you that?
> A. Yes, sir, and that hurt beyond compare."

This testimony must be accepted as true for the purposes of this appeal and raises an inference for the jury's consideration. *Gunnels v. Roach*, 243 S. C. 248, 133 S. E. (2d) 757 (1963).

There was further evidence the relationship between the testator and his son, James, the principal beneficiary and executor under the will, was of a fiduciary nature. James was the oldest son of the testator in whom he reposed trust and confidence, and inferentially was dominated by him. The testator's home adjoined his son's home and, after he became ill he slept there. James Byrd was authorized to sign checks on his father's bank accounts. The evidence reveals he did so and took care of his father's business in Marion after he became ill.

In this respect, the facts are analogous to those in *Moorer, et al. v. Bull et al.*, 212 S. C. 146, 46 S. E. (2d) 681 (1948) where we held sufficient for the jury on the issue of undue influence, evidence that her son was closely associated with her and transacted her business, that she was in fear of him, and that he stated he would procure her estate for himself. We stated with approval:

"Where the contestants introduce testimony raising a presumption of undue influence by a beneficiary sustaining a confidential or fiduciary relation toward the testator, the issue should be submitted to the jury, as where, in addition to the factor of confidential relations, there also appear the further facts of an *unnatural disposition* making the person charged with the undue influence chief beneficiary, and that such person generally dominated the testatrix.[2] (Emphasis added). 68 C. J. § 919, p. 1099. Also see 95 CJS, Wills, § 463, p. 445; 94 CJS, Wills, § 239, pp. 1096-1097; *Lackey v. Lackey* [262 Ala. 45] 76 So. (2d)

---

[2] While it is settled law that the issue of undue influence should be resolved in light of the proposition that a sane testator has the right to dispose of his property as he chooses, *Calhoun v. Calhoun, supra; Harris v. Berry,* 231 S. C. 201, 98 S. E. (2d) 251 (1957), the testator's *unnatural disposition* of his property is particularly striking. Although there was a strong band of affection between the testator and his ten other surviving children, it is singular the only living child mentioned in the will by name was James Otto Byrd, to whom he bequeathed his personal property consisting of about $50,000.00 in cash and all of his real estate, subject only to the right in each of his children and the son of a deceased child to select a lot at random out of his two tracts. There is the further proviso that none of the real estate "shall be sold or mortgaged" within fifty years of his death. The *record discloses* no rational purpose for the testator virtually to disinherit all of his loved ones other than his son James.

761 (Ala. 1954); *Hubbard v. Moseley*, [261 Ala. 683] 75 So. (2d) 658 (Ala. 1954).

This case is to be distinguished from *Calhoun v. Calhoun*, supra, strongly relied upon by the appellants, where we recently held the evidence of undue influence insufficient to make out a jury question. In *Calhoun* there was no proof of coercion or interference in any way by the chief beneficiary in the making of the will; and great importance was attached to the fact the testator had unhampered opportunity — almost three years after the making of the will — to revoke it subsequent to the operation of any undue influence upon him. *Here* the will was executed by the testator less than six months before his death. During all of this time he was physically and mentally infirm by reason of terminal cancer, was confined to his home and hospitalized and incapacitated from attending to his affairs; and inferentially, unable to exercise the will to revoke it had he so wished because of the continuing influence and domination by James and his family and the threats to place him in a nursing home.

These circumstances, combined with proof of a fiduciary and confidential relationship, and James' admission of his role in the procurement of the will, clearly distinguish this case from *Calhoun*, and require submission to the jury of the issue of undue influence. See also *Harris v. Berry*, 231 S. C. 201, 98 S. E. (2d) 251 (1957); Favored Beneficiary Rule, 94 C. J. S. § 239, p. 1097.

Appellant's remaining exceptions charge the trial judge with error in failing to grant appellant's motion for mistrial on the ground the verdict was not unanimous and in attempting to send the jury back a second time, in violation of § 14-7-1330 of the 1976 Code. We disagree.

The record shows that the verdict as returned by the jury was signed by the foreman in accordance with the judge's instructions, and he answered affirmatively to the clerk's inquiry as to whether the jury had reached a verdict, upon further inquiry by the court; no juror dissented.

When the jury was polled at the request of appellant's counsel, the foreman attempted to explain he had "compromised," although stating that it was his verdict. Upon advice by the court that a response to the question was required or

the case would be sent back for further deliberations, the foreman answered affirmatively "yes."

We hold the foreman's assent to and acquiescence in the verdict as to undue influence to be unequivocal. His attempt to explain his reasoning process in deliberating on the verdict or to discuss extraneous matters not appropriate to the question posed would not vitiate the verdict, which was unanimous. An analogous situation where the Court held likewise is *Nolan v. Boulware*, 21 N. C. App. 347, 204 S. E. (2d) 701 (1974); also see 89 C. J. S., Trial § 490, page 152.

We affirm the verdict of the trial jury.

Affirmed.

LEWIS, C. J., and GREGORY, J., concur.

LITTLEJOHN and HARWELL, JJ., dissent.

HARWELL, Justice (dissenting):

Allowing the trial judge to submit the issue of undue influence to the jury contravenes the agelong South Carolina policy of the individual's freedom to dispose of his property as he desires. Furthermore, this result is inconsistent with our recent decision in *Calhoun v. Calhoun*, 277 S. C. 527, 290 S. E. (2d) 415 (1982).

In September 1977, Otto Byrd died testate in Marion County at the age of 76. His physician diagnosed cancer of the prostate approximately one year earlier. While his health was failing, the testator resided with his eldest son, the appellant, who lived next door to him. Respondents, the testator's other heirs, allege that appellant unduly influenced Mr. Byrd to will him the greatest portion of the estate. Of the five respondents who testified at trial, none lived in Marion near the testator, two lived in Florence, two lived in Utah, and one in Virginia. Appellant, then, was the logical choice to take care of the testator.

Respondents' evidence of undue influence and of the testator's insufficient mental capacity on March 25, 1977 consisted of the following:

(1) That after the will was executed, the respondents were not permitted to visit alone with the testator.

(2) That they were not allowed to talk on the phone with him.

(3) That the testator did not recognize them during their visits.

(4) That the testator would not converse with them during their visits.

(5) That appellant set an 8:00 P.M. curfew on respondent's visits with the testator.

(6) That the testator became lost while driving his car.

The probate court and the jury properly determined that the testator had sufficient testamentary capacity to execute the March 25, 1977 will. However, there was not sufficient evidence of undue influence to submit to the jury. Although the record reflects that the testator drove his car until July, 1977, none of the respondents testified that he ever telephoned or visited *them*. However, the testator's girlfriend testified that as late as July, the testator drove his car to see her. Therefore, the testator had the means to visit the respondents who lived in Marion and Florence had he so desired.

Furthermore, all but one of the testifying respondents stated that they had never requested to be alone with the testator. They all testified that they were never physically restrained from seeing their father.

The record shows that the testator, a retired farmer, was an independent, uneducated, self-made man who had accumulated a great deal of real estate. Witnesses testified that the testator manifested his independence through June and July 1977. He drove his car to the repair shop in April and June 1977, asked for specific repairs, and signed the checks for the work. The owner of the auto repair shop testified the testator came alone. A farmer who rented the testator's land stated that the testator requested a rent increase during the 1977 season. The secretary of the testator's Sunday School class produced the attendance records indicating that the testator attended the class through June 1977. The vice president of the testator's bank testified that on July 16, 1977, the testator signed the required form to get into his safe deposit box.

Witnesses also testified concerning the testator in March 1977, the month he executed the will. The testator's attorney, who had represented him for over forty years, emphatically

stated that the testator was competent on the day he executed the will. He testified that throughout the years, the testator had changed his will four to six times. On each occasion, the testator came to his office alone. Furthermore, he stated that the testator was hurt when his children moved away from him. "He loved them all, but there was one thing that hurt him; he wanted them all together and some had left him and that was a source of grief to him." In the attorney's opinion the testator definitely knew how he wanted to divide his property among his children. Additionally, both witnesses to the will stated the testator appeared mentally competent. Finally, the testator's physician stated that when he examined him on March 23, 1977, the testator was in good spirits. Based upon his medical experience and his knowledge of the testator's medical history, he opined that the testator was rational two days later when he executed the will.

Recently, we discussed the essentials of proving undue influence and lack of testamentary capacity in *Calhoun v. Calhoun, supra.* When a will is admitted to probate, the contestants must carry the burden of proving undue influence. That influence must amount to a force and coercion which destroys the testator's free will. Opportunity and motive to influence are not sufficient. We must uphold a testator's will even though he may act unjustly toward his family in the disposition of his estate. Furthermore, when the testator has had the unhampered opportunity to revoke his will subsequent to any undue influence, but does not, we consider the effect of any testimony bearing upon undue influence in a large measure destroyed. The testator in the case at bar conducted business alone in the months after he made his will but did not choose to revoke the will.

The majority opinion in this case asserts that *Calhoun* is distinguishable because the chief beneficiary in *Calhoun* did not coerce or influence the testator. However, the beneficiary had visited the testator daily in the nursing home, she had asked a physician to examine him before he changed the will, and she drove him to the attorney's office to prepare his new will. Someone overheard the testator say that she "wanted it all."

In my opinion, under *Calhoun* and our previous decisions the issue of undue influence should not have been submitted to

the jury. After a careful consideration of the record, I conclude that the trial judge should have granted appellant's motion for a directed verdict. The jury found that the testator was competent when he executed his will. This Court has no right to undermine the testator's intent to favor the child who cared for him during his dying days.

Accordingly, I would

Reverse.

LITTLEJOHN, J., concurs.