## 22359

In re The LAST WILL AND TESTAMENT OF Holly B. SMOAK, *Ex parte* Janette W. MARTIN and Rufus C. Martin, individually and as Executrix and Executor of the Last Will and Testament of Holly B. Smoak, Appellants, v. Philip P. SMOAK, Robert L. Smoak, Mrs. M. C. Smoak Jennings, Harry H. Smoak, Mrs. Lavonia S. Reaves, Townsend S. Way, Mrs. Blanche W. Esclavon, Mrs. Aubrea W. Westervelt, Mrs. Thelma W. Parler, Mrs. Mellie W. Keller, J. Wilson Hipp, and G. H. McCain, Jr., *Ex parte* Dorothy M. SMOAK, a major beneficiary under a prior Will of Holly B. Smoak dated May 14, 1979, Respondent.

(334 S. E. (2d) 806)

Supreme Court

*J. Kenneth Rentiers* and *O. Eugene Savedge*, Charleston, *for appellants.*

*Robert M. Hollings* and *Philip A. Middleton*, Charleston, *for respondent.*

Heard Jan. 9, 1985.

Decided Aug. 9, 1985.

LITTLEJOHN, Chief Justice:

This case involves the validity of the Will of Holly B. Smoak who died at age ninety on December 30, 1980. His will of October 1979 was probated in both common and solemn forms. Thereafter, Dorothy M. Smoak, widow of the testator's nephew and respondent herein, appealed to the Court of Common Pleas where the case was tried *de novo* by a jury. The jury invalidated the Will holding that it was the result of undue influence. The effect of this was to revive his previous Will of May 1979 wherein Dorothy M. Smoak faired more abundantly. The testator's niece, Janette W. Martin, and her husband, Rufus C. Martin, are executors of the Will and have appealed the jury verdict submitting that the trial judge should have directed a verdict in their favor on the undue influence issue. We agree and reverse.

Inasmuch as a motion for a directed verdict should be granted or denied based upon the whole of the evidence, a full review of the evidence before the court at the time of the motion is essential.

The testator Holly B. Smoak lived on his farm in Charleston County with his wife who died in May 1979. They had no children. His health had been deteriorating for some time prior to his wife's death and he required constant attention. He was unable to attend to his personal needs and was bedridden. At the same time, he remained mentally alert and maintained his basic characteristic of firm determination.

His niece Janette W. Martin and her husband lived close by. Another niece Aubrea W. Westervelt (who had two children) also lived close by. Dorothy M. Smoak, wife of his deceased nephew, lived about two miles away and had been advantageously employed at the ship yard at Charleston for many years. She had two daughters who were grown or nearly so.

Holly B. Smoak and his wife, Iva, had apparently made reciprocal Wills. Holly B. Smoak was named as Executor of his wife's Will with Janette W. Martin to serve alternately. He had her serve as administratrix c.t.a. Promptly after the death of his wife, the testator summoned Attorney Horlbeck of Charleston and executed a new Will. He also executed a full Power of Attorney in favor of his niece Janette W. Martin. Under the terms of this May 1979 Will, one-third of

his substantial estate was given to his niece Janette W. Martin, one-third was given to his niece Aubrea W. Westervelt and one-third was given to his niece by marriage, Dorothy M. Smoak, the contestant of the Will and the respondent herein. Janette W. Martin was named sole executrix.

Since the testator had no children, someone outside the immediate family had to care for him. Dorothy M. Smoak was employed and was not in a position to render meaningful help. About a week after the death of Mrs. Smoak, Janette W. Martin and her husband moved their uncle into their own home and adapted their residence to his semi-hospitalization needs.

Five months after the first Will was executed, in October 1979, Mrs. Martin, at the instructions of the testator, had her own attorney, Kenneth Rentiers draw a new Will. Under the terms of this Will, one-third of the substantial estate went to Janette W. Martin and her husband, Rufus C. Martin, who were named co-executors, one-third went to his niece Aubrea W. Westervelt and one-third went to the children of Aubrea W. Westervelt, to wit, Randy W. Westervelt and Theodore Westervelt, Jr. A $2,000 bequest in money was made to Dorothy M. Smoak.

This Will contest is a bit unusual in that the one who is alleged to have exerted undue influence normally gains if the Will is sustained. Here Mrs. Martin takes less under the new Will, but she and her husband together take the same estate she would inherit under the Will of May 1979. Mrs. Westervelt inherits the same. This means that the contest is really between Dorothy M. Smoak on the one hand and the children of Mrs. Westervelt on the other.

It is uncontested that Mrs. Martin and Mrs. Westervelt who lived close by were in a position to and did administer to the testator's needs at the home of Mrs. Martin from May 1979 until July 1980. During that time Mrs. Dorothy M. Smoak continued to work at the ship yard and visited the testator periodically. It is her contention that she was not always permitted to see him, but this is denied by Mrs. Martin.

In July 1980, the condition of the testator had deteriorated to the point that it became impossible to administer fully to his needs at home. Mrs. Martin arranged for him to enter a

nursing home at Beaufort approximately seventy miles away. Mrs. Martin continued to attend to his needs under her power of attorney and did whatever was reasonably calculated to comfort him in his declining days of ill health. He died after being in the nursing home almost six months.

Over the years, Dr. William McGill Woodward an internist, psychiatrist and geriatric medical doctor had administered to the testator's needs. For several years Holly B. Smoak visited Dr. Woodward's office. In later years, Dr. Woodward would make house calls to attend Mr. Smoak. These visits were characterized as sometimes professional and sometimes personal. After Mrs. Iva Smoak's death and while Janette W. Martin had power of attorney, it was revealed that Dr. Woodward had entered into a contract to buy the testator's farm upon his death. The farm consisted of approximately thirty acres. The sale price was approximately $16,000 and the doctor was paying at the rate of $20 per month. It was the doctor's testimony that the testator had asked him not to reveal that he had entered into such contract. Disagreement developed between Mrs. Martin and the doctor relative to whether interest would be paid and whether a deed should be given to the doctor without a mortgage on the premises as security. The relationship became unpleasant, and Dr. Woodward sent her a bill for $5,600 which was reluctantly paid. The real estate transaction was finalized. Dr. Woodward moved into the farmhouse almost immediately after the testator moved into the home of his niece. His physician services were discontinued about a month later in February 1980.

We now turn to the basic issue which confronted the judge at the time the motion for a directed verdict was made: Was the evidence, considered as a whole, susceptible of the inference that the October Will was the result of undue influence?

The Will was sustained at two hearings in the Probate Court. It was drawn by an attorney, properly witnessed and signed and was valid on its face. At the jury trial, Mrs. Smoak, the contestant, had the burden of proving invalidity. In this particular case she had to prove that the instrument was not the product of the testator's desire, but was a result of influences which overcame his

own thinking and his right to dispose of his property as he chose. In order to prevail, the contestant must present evidence which unmistakenly and convincingly points to the fact that the mind of the testator was subservient to that of other persons so that the Will was in truth that of the other person or persons and not that of the testator.

> It is the settled law of this state that when the formal execution of a will is admitted or proved, a prima facie case in favor of the will is made out, and that, as a general rule, the burden is then on the contestants to prove undue influence, incapacity or other basis of invalidation, and such burden remains upon the contestants throughout. In determining whether the contestants sustained such burden, the evidence has to be viewed in the light most favorable to the contestants.

*Havird v. Schissell,* 252 S. C. 404, 166 S. E. (2d) 801 (1969). We hold that the burden of proof has not been carried.

A Will contest based on alleged undue influence is most often adjudicated on the basis of circumstantial evidence. Circumstantial evidence is sufficient proof in a civil case including a Will contest, but only if there is circumstantial evidence warranting the conclusion sought.

The mere existence of influence is not enough to vitiate a Will. The influence must be of such a degree that it dominated the testator's will, took away his free agency, and prevented the exercise of judgment and choice by him. If the testator had the testamentary capacity to dispose of his property and was free and unrestrained in his volition at the time of making the Will, the influence that may have inspired it or some provision of it will not be "undue influence." *Smith v. Whetstone,* 209 S. C. 78, 39 S. E. (2d) 127 (1946); *Mock v. Dowling,* 266 S. C. 274, 222 S. E. (2d) 773 (1976). A mere showing of opportunity and even a showing of motive to exercise undue influence does not justify a submission of that issue to a jury, unless there is additional evidence that such influence was actually utilized. *Calhoun v. Calhoun,* 277 S. C. 527, 290 S. E. (2d) 415 (1982).

As indicated hereinabove, the Will was probated in both common and solemn forms and was regular on its face. Mrs. Smoak, the contestant, testified as follows:

Q: Do you have any personal knowledge of the circumstances under which the that Will was executed or made?

A: No.

Although the Will was regular in all respects and admitted to probate, the contestant did not call any of the witnesses who could have shed light on the facts she hoped to establish. At least one of the witnesses was in the Court room.

The respondent, Mrs. Smoak, attempts to sustain the verdict of the jury relying upon several tidbits of evidence truly having no probative value. While in the nursing home, one of Mrs. Smoak's daughters, Patricia Smoak, visited the testator, she testified as follows:

A: ... And, as a matter of fact, the last time that I saw him when I was there, he just seemed so unhappy. And I said, granddaddy, please tell me what I can do for you. And I was standing by the bed, and I had my hands on the bedrail, and he put his shaking hands on mine, and he said, oh, it's just too late. There's nothing you can do. It's just too late. There's no time.

Q: When he said that, had you ever had any other conversations about it's too late?

A: Yes, but I never could understand what he meant, because he never would tell me. And he said, there's not time. I said, granddaddy, I have all the time in the world you need. You just tell me what's wrong, and I'll see if I can help you. But I never found out.

It is argued that Mr. Smoak was referring to the Will, but patently, he was saying that it was too late for her to do anything for him. Mrs. Smoak submits that the fact that she was discouraged from seeing her uncle (which is denied) tends to prove that the Will was the result of undue influence. The conclusion simply is not warranted even if believed.

She also argues in effect that the testator was more fond of her children than he was of the Westervelt children — all of which proves nothing. A testator may make an unjust or unreasonable distribution of his estate if he wishes and may discriminate against and exclude members of his own family

who normally might be objects of his affection. The record reflects that the testator was an intelligent, strong-willed man who maintained clear mental health up until the time of his death despite a rapidly deteriorating condition. He lived fourteen months after the execution, yet the record does not reveal his expressing any desire to alter his Will of October 1979.

That evidence which apparently concerned the trial judge and caused him to submit the issue to the jury is reflected in his comment in response to a motion for a nonsuit. He referred to the testimony of Dr. Woodward and commented:

> The only evidence that we've got in the case is that mentally, he was clear. Apparently, even up to the time of his death. But then comes along the testimony of Dr. Woodward, unobjected to, that, in his opinion, he's someone who dealt with him and knew him as a medical doctor and qualified in psychiatric and geriatric medicines, that there has been undue influence. ... If it wasn't for that, then I would think under the rules that our law sets forth, that the case shouldn't be sent to the jury.

The testimony to which the judge referred was as follows:

Q: Dr. Woodward, having known and treated Holly Smoak for the number of years which you treated him, having known him also intimately and his family, do you have an opinion as to whether or not his will and free control was diminished during the period that he stayed in the home of Janette Martin?

A: I do.

Q: And what is that opinion?

A: I think that — that he was taken over by Janette Martin, and I think that she impressed her will upon Mr. Smoak.

Q: Knowing Mr. Smoak and knowing the objects of his affection, do you believe that the Will executed on October 11, 1979, was the result of — do you have a medical opinion to a reasonable medical certainty as to whether or not this Will was the result of any undue influence?

A: I think so.

The conclusion of the doctor is obviously drawn out of thin air. He knew absolutely nothing about the circumstances under which the Will was executed. He gave no basis for the conclusion which he reached. Over and above the fact that he was obviously angry with Mrs. Martin for having discharged him and for having raised issues relative to the procurement of testator's farm, the testimony had no probative value and did not warrant the conclusion that Mrs. Martin, or any other person, substituted her determination for his will and right to dispose of his property.

Moreover, the doctor's conclusion was in the form of expert opinion testimony, given in answer to questions relating, not to mental capacity, but to undue influence: (1) "... do you have an opinion as to whether or not *his will and free control* was diminished during the period that he stayed in the home of Janette Martin?", and (2) "... do you have a medical opinion to a reasonable certainty as to whether or not this Will was the result of any *undue influence?*" (Emphasis supplied).

Had his expert opinion testimony related to mental capacity it might properly have been considered on that issue. It related, however, to the element of undue influence and, being based upon no evidence, had no probative value.

The respondent Mrs. Smoak here seeks comfort in the case of *Byrd v. Byrd*, 279 S. C. 425, 308 S. E. (2d) 788 (1983). Admittedly, there are some similarities but the facts in no two cases are identical. *Byrd* was a borderline case decided by this Court by a 3-2 vote. If the case before us is borderline, it falls on the other side of the border.

In this day of a complex society, individuals must sacrifice much and give up individual rights because of the interests of others. The government imposes many restrictions and requirements, but one of the basic rights known to our civilization is the privilege of disposing of property by Will as one elects. "The right to make a will, is the right to make it according to the testator's pleasure — judiciously or capriciously — justly or unjustly — at absolute discretion, subject only to the restraints upon the power of disposition which the law has imposed." *Means v. Means*, 36 S.C.L. (5 Strob.) 167 (1850).

Not even the court nor its jury is permitted to rewrite one's will, which is what has taken place here.

We recognize the well fixed rule of law that when the evidence is susceptible of more than one reasonable inference, the question is one for the jury. This rule of law gives way to a rule of common sense applicable here. A jury issue is not created by an inference — only by a reasonable inference. To reach the conclusion that the evidence is susceptible of more than one reasonable inference, one must supplement the record with his imagination. We hold that the judge erred in failing to grant the directed verdict and order that the case be remanded to the lower court for entry of judgment upholding the Will of Holly B. Smoak dated October 11, 1979.

Reversed and remanded.

HARWELL and CHANDLER, JJ., concur.

NESS and GREGORY, JJ., dissenting in separate opinion.

GREGORY, Justice, dissenting:

I dissent. The sole issue on appeal is whether there was sufficient evidence to submit the question of undue influence to the jury. I would hold the evidence sufficient and affirm the jury's verdict.

In a will contest, the contestants clearly have the burden of proof as to any alleged invalidity once due execution of the challenged will is proved. *Byrd v. Byrd*, 279 S. C. 425, 308 S. E. (2d) 788 (1983); *Calhoun v. Calhoun*, 277 S. C. 527, 290 S. E. (2d) 415 (1982). Although circumstantial evidence may be used to prove undue influence, such evidence must "... point unmistakably and convincingly to the fact that the mind of the testator was subjected to that of some other person, so that the will is that of the latter and not of the former." *Havird v. Schissell*, 252 S. C. 404, 411, 166 S. E. (2d) 801, 804 (1969). The influence "... must amount to force and coercion, destroying free agency ...," and the issue of undue influence should be resolved in the light that a sane testator has a right to dispose of his property as he chooses. *Calhoun*, 277 S. C. at 532, 290 S. E. (2d) at 418.

Using these strict standards, a review of the evidence clearly demonstrates the existence of a factual issue warranting submission of the case to the jury.

The testator and his wife were very close to respondent's family for many years. The Smoaks, who were childless, referred to Dorothy's daughters as their grandchildren and treated them accordingly. Mrs. Smoak's will provided for a substantial cash bequest for Dorothy's daughters.

Immediately after his wife's unexpected death, Mr. Smoak summoned his attorney, Mr. Horlbeck and directed him to draft a new will. Mr. Horlbeck had been the Smoaks' personal attorney for a number of years and had drafted Mr. Smoak's previous will. The new will, executed in May 1979, was necessary since the previous will left virtually everything to Mrs. Smoak.

For several years, Mr. Smoak's health had steadily declined. By the time of Mrs. Smoak's death, he was totally dependent on others for his care. Mr. Horlbeck was directed to draft a power of attorney, naming appellant Janette Martin as his attorney in fact.

Despite offers from Dr. William Woodward and respondent to assist with Mr. Smoak's care, Mrs. Martin moved him into her home, taking complete charge of him and his affairs.

After Mr. Smoak was moved into the Martin home, contacts by respondent and her daughters with Mr. Smoak were involuntarily curtailed. They were frequently denied visits, being told that Mr. Smoak was sleeping, or not feeling well. They began coming to the front door of the Martin home so Mr. Smoak could hear them, and call them in. They were never allowed to visit Mr. Smoak alone.

Dr. William Woodward had been Mr. Smoak's personal physician and close friend for many years. He visited on a weekly basis because of Mr. Smoak's deteriorating health. He testified that he felt intimidated when visiting the Martin home and was never left alone with his patient, even when he had to do full physical examinations of Mr. Smoak. After a dispute with Mrs. Martin involving his purchase of Mr. Smoak's house. Dr. Woodward visited less frequently. Eventually, Mrs. Martin (rather than Mr. Smoak) dismissed him. Mrs. Martin's attorney wrote Dr. Woodward and re-

quested that he send Mr. Smoak's file to another physician.

At trial, without objection from appellant's counsel, Dr. Woodward was qualified as an expert in geriatrics. His opinion was, in light of the testator's serious physical ailments and dependency on others, he was vulnerable to influence. The majority's contention that his opinion had no basis is completely at odds with the record. Dr. Woodward's years of constant care provide an ample basis for his opinion.

Between the preparation of the May will and October will, Mr. Smoak's health declined rapidly.

In marked contrast with the May will, the October will was drafted by Mrs. Martin's attorney, instead of Mr. Smoak's regular attorney, Mr. Horlbeck. Mrs. Martin called her attorney in to draft the will, and it is evident she was heavily involved in its preparation. The testimony suggested that she may have, in fact, dictated the October will. It should also be noted that Mrs. Martin fired Mr. Horlbeck as Mr. Smoak's attorney, even though Mr. Horlbeck was handling Mrs. Smoak's estate at the time.

Of special note is the fact that the attorney who drafted the October will was never called to testify, though this possibility was suggested by appellants at trial. His testimony would have been dispositive on the issues at trial "...[W]hen the circumstances in proof tend to fix a liability on a party who has it in his power to offer evidence peculiarly within his knowledge of all the facts as they existed and rebut the inferences which the circumstances in proof tend to establish, and he fails, without satisfactory explanation, to offer such proof, the presumption is that the proof, if produced, would support the inferences against him." *Collins v. Merrimack Mut. Ins. Co., et al.,* 210 S. C. 207, 212-13, 42 S. E. (2d) 67, 70 (1947). Since the record is replete with evidence supporting the claim of undue influence, the presumption operates regarding this obviously missing testimony.

Regarding the change in beneficiaries, there was testimony that Mr. Smoak did not care for one of the new beneficiaries.

Mr. Smoak's health continued to fail. At one point, he was admitted to a local hospital. Respondent's family was not

told, and found out only when one of Dorothy's daughters had a chance meeting with Mr. Martin at the hospital.

Eventually, Mr. Smoak was placed in a nursing home. He had great difficulty communicating with others. During one visit, respondent's daughter heard him say, "It's too late", appearing very disturbed. She testified she believed he was referring to the will; however, his inability to communicate prevented him from explaining the comment.

Additionally, Mrs. Martin was in a fiduciary relationship with the decedent. This relationship, while not giving rise to a presumption of influence, Karesh, *Wills*, at 25, demonstrates the trust and confidence placed in Mrs. Martin and was proper evidence of domination. *See Byrd*, 279 S. C. at 430, 308 S. E. (2d) at 791.

The facts of this case are very close to our decision in *Byrd*. As in the *Byrd* decision, viewing the evidence in a light most favorable to respondent, the circumstances and the fiduciary relationship between Mrs. Martin and the testator created a clear factual question of undue influence. These factual disputes were properly submitted to, and resolved by the jury.

Appellants also argue that Mr. Smoak had over a year between the execution of the October will and his death, and could have changed it once he was transferred from the Martin home to a nursing home.

Where a testator has an unhampered opportunity to negate any will procured by undue influence, and does not do so, the allegations of undue influence are destroyed. *Calhoun*, 277 S. C. at 533, 290 S. E. (2d) at 419. In *Calhoun*, there was evidence that the testator transacted business after the execution of the disputed will. Here, there is no such evidence. At the time of the October will, Mr. Smoak's physical condition had deteriorated so as to preclude any business transactions. He also had great difficulty communicating. Since his condition never improved, he had no unhampered opportunity to revoke the October will. ·

The majority opinion places this Court in the position of making findings from evidence replete with factual disputes. Such is not our function. Substantial evidence of undue influence was presented to the jury. By its unanimous ver-

dict, the jury properly resolved the factual issues. The verdict should be affirmed.

NESS. J., concurs.