597 S.E.2d 12

**Roger A. GADDY, M.D., as Attorney–
in–Fact for Ms. M, Respondent,**

**v.**

**George G. DOUGLASS, III and William P.
Sherrod, as purported Attorneys–in–
Fact for Ms. M, Appellants.**

**No. 3797.**

Court of Appeals of South Carolina.

Heard Jan. 14, 2004.
Decided May 17, 2004.

330

Desa A. Ballard, of West Columbia and S. Murry Kinard, of Lexington, for Appellants.

S. Jahue Moore, of West Columbia and Thomas H. Pope, III and W. Chad Jenkins, both of Newberry, for Respondent.

KITTREDGE, J.:

Dr. Roger A. Gaddy brought this action as the attorney-in-fact for Ms. M [1] against George G. Douglass, III and William P. Sherrod (Appellants) seeking to declare invalid a March 12, 1999 power of attorney executed by Ms. M in favor of Appellants and the concomitant revocation of Ms. M's durable power of attorney executed in 1988. Appellants, third cousins of Ms. M, appeal the trial court's order finding that Ms. M lacked capacity to execute the documents. We affirm, finding that on March 12, 1999, Ms. M was suffering from chronic and severe dementia caused by the advanced state of Alzheimer's disease. We, however, vacate the trial court's *sua sponte* finding that Ms. M lacked testamentary capacity on March 12, 1999.

## *STANDARD OF REVIEW*

"A suit for declaratory judgment is neither legal nor equitable, but is determined by the nature of the underlying issue." *Felts v. Richland County*, 303 S.C. 354, 356, 400 S.E.2d 781, 782 (1991). "[A]n action to set aside a power of attorney and an instrument revoking a power of attorney on the ground of a lack of mental capacity sounds in equity." *In re Thames*, 344 S.C. 564, 571, 544 S.E.2d 854, 857 (Ct.App. 2001). We thus utilize an equity standard of review. As such, this court has jurisdiction to find facts in accordance with its own view of the preponderance of the evidence. *Pinckney v. Warren*, 344 S.C. 382, 387, 544 S.E.2d 620, 623 (2001). However, this broad scope of review does not require an appellate court to disregard the findings below or ignore the fact that the trial judge is in the better position to assess the credibility of the witnesses. *Id.* Additionally, Appellants carry the burden of proving that the trial court made erroneous findings. *Id.*, 344 S.C. at 387, 544 S.E.2d at 623–24.

## *FACTS*

Ms. M was born in 1918 and grew up in Fairfield County. She moved to Greenville, where she majored in sociology at

---

1. We recognize that Ms. M's true identity may be discovered through public records and otherwise. We merely desire to preserve some vestige of respect and decency for this elderly woman as she faces the end of her life's journey in the grip of debilitating dementia caused by Alzheimer's disease.

Furman University and later worked for the South Carolina Department of Social Services. After retiring, Ms. M returned to Fairfield where she lived on her family farm with her brother, a dentist, until his death in the early 1980s. Ms. M never married.

Dr. Gaddy was Ms. M's physician and a close family friend.[2] Ms. M and Dr. Gaddy's family lived on nearby farms and visited each other frequently throughout the 1980s and 1990s. For many years Ms. M spent holidays and birthdays with the Gaddy family rather than her own family. She also attended the Gaddy family reunions and visited Dr. Gaddy's family in Aiken. Eventually, Ms. M grew to refer to Dr. Gaddy as her "son" and his children as her "grandchildren."

Conversely, Ms. M had little contact with many of her relatives, including Appellants.

In 1988, Ms. M asked Dr. Gaddy to accompany her to a meeting with Albert C. Todd, III, her estate-planning attorney.[3] After Ms. M met privately with Todd, Dr. Gaddy was called into Todd's office, at which point Todd informed Dr. Gaddy that Ms. M desired for Dr. Gaddy to handle her affairs. Dr. Gaddy consented. Ms. M then executed a durable general power of attorney (1988 durable power of attorney) designating Dr. Gaddy as her attorney-in-fact. She also executed a will (1988 Will) leaving Dr. Gaddy her personal property and farm, and appointing him as trustee of a revocable trust she created to provide scholarships to the Medical University of South Carolina.

Dr. Gaddy did not immediately record the 1988 durable power of attorney, and Ms. M continued to manage her affairs. However, by 1994, Ms. M began showing signs of dementia. For example, she became forgetful, locked herself out of her home, and neglected her personal hygiene. She eventually stopped cooking and cleaning for herself. Concerns about Ms. M's progressively worsening mental condition prompted Dr.

---

**2.** Dr. Gaddy has continuously practiced medicine in Fairfield County since 1981, during which time he served as chief of staff at a local hospital and president of the South Carolina Medical Association.

**3.** At one time, Ms. M's assets included a 200–acre farm in Fairfeld County, on which her home was situated, securities, and a checking account containing approximately $339,000 in cash.

Gaddy to file the 1988 durable power of attorney in November 1995. Pursuant to the 1988 durable power of attorney, Dr. Gaddy began to act as Ms. M's attorney-in-fact and assumed control of her finances, farm, and health care. His responsibilities included paying her bills, tilling her garden, repairing fences, and hiring caregivers.

In March 1996, Dr. Gaddy discovered Ms. M had fallen in her home and fractured a vertebra. Ms. M was hospitalized for six weeks. During the hospitalization, Dr. Gaddy fumigated and cleaned her home, which had become flea-infested and unclean to the point where rat droppings were found in the house. Finding that Ms. M was not mentally competent to care for herself, he arranged for full-time caretakers to attend to her after she recovered from the injuries she sustained in her fall. He made improvements in her home, including replacing moth-eaten area rugs with new rugs and upgraded her kitchen to enable caretakers to prepare her meals. Dr. Gaddy also made plumbing repairs to the house, and took steps to adapt a bathroom to make it safer for caretakers to bathe Ms. M, who was incapable of doing so unassisted. During Ms. M's hospitalization, neither of the Appellants visited her in the hospital or sought to assist her in any manner.

Dr. Gaddy had Ms. M examined and evaluated by Dr. James E. Carnes, a neurologist, in December 1996. After examining Ms. M, Dr. Carnes found that she suffered from dementia and confirmed she was unable to handle her affairs.

As Ms. M's Alzheimer's disease progressed and her faculties deteriorated, Dr. Gaddy managed her financial affairs, oversaw maintenance of her properties, and ensured that she received constant care including food, clothing, bathing, and housekeeping. He also constructed a metal barn for multiple purposes, including the storing of Ms. M's personal property and farm equipment used to maintain the 200–acre farm. The barn also included small living accommodations that Dr. Gaddy planned to use to house a caretaker or someone to maintain the farm.

Ms. M's long-standing distant relationship with some members of her family, including Appellants, changed in March of 1999.

On March 12, 1999, Appellants visited Ms. M, and with the help of disgruntled caretaker Lil Heller, took her to an appointment with Columbia attorney Douglas N. Trulsow to "get rid of Dr. Gaddy." [4] On the drive to Truslow's office, Heller had to remind Ms. M several times of their destination and purpose. At Truslow's office, Ms. M signed a document revoking the 1988 Will and the 1988 durable power of attorney. She also signed a new durable power of attorney (1999 durable power of attorney) naming Appellants as her attorneys-in-fact. Appellants failed to disclose Ms. M's dementia to Truslow.[5] David Byrd, a witness to the execution of the March 12 documents, was likewise not informed of Ms. M's dementia.

Armed with the revocation of the 1988 power of attorney and recently executed power of attorney in their favor, Appellants prohibited Dr. Gaddy from contacting Ms. M. Dr. Gaddy was even threatened with arrest if he tried to visit Ms. M.

On March 15, 1999, three days after Ms. M purportedly revoked the 1988 documents and executed the 1999 durable power of attorney, Dr. Gaddy initiated the present action as her attorney-in-fact pursuant to the 1988 durable power of attorney. He alleged, among other things, that the purported revocation of the 1988 durable power of attorney and the execution of the 1999 durable power of attorney were invalid because "on March 12, 1999, the date on which Ms. M purportedly signed the 1999 power of attorney and the revocation, she was not mentally competent" due to "senile dementia of the Alzheimer's type." The action sought declaratory judgment to

---

**4.** The trial court found that Heller "had at least some bias in favor of" Appellants because Dr. Gaddy had declined her repeated requests to be switched from her weekend shift to a weekday shift. Once Appellants assumed control of Ms. M's affairs in March 1999, they rewarded Heller with the shift she wanted and several pay raises.

**5.** Ms. M did not schedule the appointment with Truslow. It is not our intent to assign nefarious motives to Truslow, for he was simply a pawn in Appellants' scheme to gain control over Ms. M's assets. Indeed, Truslow admitted that he "might have done things differently" had he known the truth about Ms. M's condition. When asked if "there's some things that you now know that you did not know when you [sic] executed the revocations" Truslow responded, "That's an understatement."

render the 1999 durable power of attorney invalid and declare the 1988 durable power of attorney valid.

The case proceeded to trial on February 19, 2001. By order of the Chief Justice of the South Carolina Supreme Court, and with the consent of the parties, Judge Thomas L. Hughston, Jr. was appointed to preside over the case.[6] Judge Hughston conducted a four-day bench trial. During the trial, substantial medical and lay evidence was presented regarding Ms. M's progressively degenerative mental state.

Medical testimony was presented from five physicians who had examined Ms. M. One was Dr. Carnes, who examined Ms. M on three occasions from December 1996 through September 2000. Dr. Carnes, a neurologist and expert in the field of dementia, had treated "thousands" of Alzheimer's disease patients over a fifteen-year period.

Dr. Carnes first conducted a neurological exam of Ms. M in December 1996, when she was accompanied by one of her long-time caretakers, Rosemary Wade. During the examination, Ms. M could not answer simple questions such as naming the President of the United States or recalling the year or month. Dr. Carnes said he administered a typical memory test in which he showed her three objects and named the objects, and then a very short time later asked her to name the objects. Ms. M was unable to name the objects. Ms. M also had difficulty with tests designed to assess memory, language function, and "intellectual performance." Based on this first examination, Dr. Carnes determined Ms. M had moderate "senile dementia of the Alzheimer's type" and was "not capable of handling financial affairs."[7] He concluded that she was not able to make rational decisions or exercise proper judgment.

Dr. Carnes' second examination of Ms. M occurred on March 19, 1999, seven days after Ms. M executed documents revoking her 1988 Will and 1988 durable power of attorney,

---

6. The resident judges of the sixth judicial circuit, where Fairfield County is located, were disqualified due to conflicts.

7. Dr. Carnes found nothing to suggest Ms. M suffered from brain tumors or stroke. He further determined that her medications or outside stress did not affect his diagnosis.

and executed the 1999 durable power of attorney. She was accompanied by Wade and her minister. Dr. Carnes found Ms. M "pleasant" but "disoriented." When asked to identify the month and year, she would not answer. Dr. Carnes asked Ms. M to "just name any President," and she was unable to do so. She was also unable to recall three simple objects shown to her by Dr. Carnes, and was not able to reproduce simple line drawings. The balance of the examination produced similarly revealing results, leading Dr. Carnes to conclude that Ms. M's level of dementia was "moderate to severe" or in the "later stages of moderate." Dr. Carnes further opined that Ms. M would not have been able to understand the nature and effects of her acts, make rational decisions, or exercise proper judgment. He added that she would not have been able to know the extent of her estate, exercise proper judgment regarding the distribution of her estate, or have been able to understand the execution and meaning of legal documents.

Dr. Carnes examined Ms. M a third time in September 2000. She was accompanied by Lil Heller, the caretaker who accompanied Ms. M to attorney Truslow's office, and Lynn Douglass, a third cousin of Ms. M's. During this examination, Ms. M did not know the month or year. According to Dr. Carnes, she was unable to determine whether the time of day was morning, afternoon, or evening. Ms. M told him that she was taking no medications, although she was taking a variety of prescription medicine on a daily basis. She also told Dr. Carnes that she lived alone, cared for herself, and cooked for herself. However, she had received full-time care for several years.

Based on Dr. Carnes's third examination of Ms. M, he concluded that she was severely demented although physically normal for a person her age. Dr. Carnes noted that Ms. M had "senile dementia of the Alzheimer's type ... that had progressed beyond the point when [he] saw her previously and that she had ... clearly shown progression of this disease...." Dr. Carnes added that she was "unable to handle her financial affairs" and "would need help managing her daily activities...."

When asked whether Ms. M may have had a "lucid moment" in her stage of dementia, Dr. Carnes responded, "No ... [a]

lucid moment is ... a term that doesn't fit well with ... Alzheimer's Disease." He then distinguished a psychiatric disease from Alzheimer's disease, noting the former involves treatable chemical defects while the latter involves the "progressive death of brain cells." Dr. Carnes further observed that dementia results in a "faulty rational process" or an "intellectual process that is impaired." He stated that dementia sufferers do not "fully understand the nature of what they [are] doing and they [do] not fully understand the ramifications of what [is] there."

A second neurologist, Dr. Robert R. Taylor, Jr., also examined Ms. M on March 19, 1999, the same day that Dr. Carnes examined her for the second time. Dr. Taylor practiced neurology from 1967 until his retirement in 2000, during which time he treated "thousands" of Alzheimer's patients. He described Alzheimer's disease as a cerebral degenerative disease that is organic, rather than chemical, in nature. He added that the Alzheimer's is a "primary" disease, resulting in the destruction of brain cells. As the brain disease progresses, according to Dr. Taylor, patients have increased memory problems until they are "unable to perform the daily activities of living adequately and have to have caregivers."

Dr. Taylor tested six components of Ms. M's mental faculties, including intellect, attention span, affect, and memory, "especially recent memory." He noted that her memory and intellect were "markedly impaired" and that her "judgment did not appear adequate...." For example, she "didn't recall what she had for breakfast or supper," nor did she know the month, year, or day of the week.

Dr. Taylor concluded that Ms. M was "very demented" and that her level of dementia from Alzheimer's disease was "severe" and in "advanced stages." In Dr. Taylor's judgment, Ms. M "was mentally incompetent to manage any of her business affairs or manage her daily activities of living" such as "dressing appropriately" and "prepar[ing] food adequately." In such a condition, Dr. Taylor opined that Ms. M was susceptible to influence of others and unable to "make rational decisions or exercise reasonable judgment about legal matters or any kind of business matter." He additionally noted that Ms. M would be unable "to understand the execution and

meaning of legal documents, such as [a] power of attorney and wills or revocations of those." Dr. Taylor found that Ms. M had been in such a condition "certainly for several years" before his March 1999 meeting with her. Dr. Taylor finally determined, consistent with the view expressed by Dr. Carnes, that Ms. M would not "ever have moments of lucidity" to "understand legal documents...."

Additional expert testimony was provided by a third neurologist, Dr. Charles B. McClure, who was selected by the parties to conduct an independent medical evaluation of Ms. M. Board certified in neurology and psychiatry, Dr. McClure estimated he had examined "around a thousand" Alzheimer's patients during the preceding twenty years in his practice.

Prior to examining Ms. M, Dr. McClure thoroughly reviewed her medical records, including notes from Drs. Carnes and Taylor. He performed a neurological evaluation on September 26, 2000. During his examination, he performed a "mental status exam" that indicated Ms. M was "perfectly awake and alert." Ms. M, however, did not know the President's name or the year, and that she "could not repeat three objects immediately after [Dr. McClure] gave her the objects." Based on this information and other aspects of the examination, Dr. McClure assessed that Ms. M "had a substantial dementia" and that "her dementia dated back to at least 1996." When asked if he would classify her impairment as "moderate," Dr. McClure responded, "No, I think she had significant cortical impairment." Dr. McClure explained that Ms. M doesn't "think well" and that her "memory is poor and she's just not able to cognate well."

Dr. McClure added that Alzheimer's disease, which he described as a degenerative illness in which brain cells die and never regenerate, caused Ms. M's dementia. He confirmed that the disease causes a decrease in higher cortical functioning, which leads to a loss of reasoning and impaired judgment. Dr. McClure concluded that on March 12, 1999, Ms. M lacked "sufficient mental capacity to understand legal documents such as a revocation or creation of a power of attorney."

Dr. Linda June Campbell, who saw Ms. M for a physical

examination on March 12, 1999, testified for Appellants.[8] As an internist, Dr. Campbell acknowledged that a neurologist "would definitely have more expertise than an internist" for evaluating a patient's mental status.

Ms. M was by accompanied to Dr. Campbell's office by Lynn Douglass and caretaker Lil Heller. Lynn Douglass had called Dr. Campbell and scheduled the appointment. Dr. Campbell testified that while Ms. M was in her office, one of her nurses attempted a "mini mental status exam" of Ms. M, but Ms. M's lack of cooperation prevented the nurse from finishing. She testified that Ms. M "definitely had Alzheimer's" disease and "had some mild dementia, for sure." Nevertheless, Dr. Campbell testified that on March 12, 1999, Ms. M understood "the objects of her affection and extent of properties," and "the nature and the effect[ of her actions, particularly with regards to legal documents[.]" The trial court found, as ·do we, Dr. Campbell's testimony unpersuasive. When asked if she claimed "to have any expertise in the area of Alzheimer's disease or dementia," she replied, "I don't."

Of similar import was the testimony of Appellants' second medical expert, Dr. Edward Zamrini. Dr. Zamrini, a "behavioral neurologist," determined that Ms. M suffered from "mild to moderate" dementia. He opined, however, that Ms. M had the ability on March 12, 1999, to make "a rational decision about what she wanted to do with her property[.]" Significantly, Dr. Zamrini never reviewed the records of the other neurologists, although he requested such records from Appellants. At trial, Dr. Zamrini acknowledged that he "definitely" would have preferred to have been provided with Ms. M's medical records.[9]

---

8. Dr. Campbell testified that she had examined Ms. M approximately eight times since March 1999, but limited her testimony to the findings from her examinations in that month.

9. In fairness to Dr. Zamrini, he was misled by Appellants, similar to their deceit of attorney Truslow. Dr. Zamrini's report reveals Appellants' efforts to recast the medical history of Ms. M. For example, Appellants desired that Dr. Zamrini believe that Ms. M's dementia was first noticed in 1996 with an "abrupt onset." A review of the medical records establishes the progressive nature of Ms. M's dementia. When confronted on cross-examination with the fact that short-term memory

A review of the lay testimony supports the findings of the trial court. Frank Eppes, a former circuit court judge and long-time friend of Ms. M and her late brother, testified that he had been a frequent overnight guest in their home when he held court in Fairfield County. Judge Eppes visited Ms. M an estimated ten times a year for thirty years preceding 1998. He noted that Ms. M displayed photographs of Dr. Gaddy and his family in her home, that she considered Dr. Gaddy her son and his children her grandchildren, and that Ms. M enjoyed spending her holidays with the Gaddy's.

Judge Eppes observed that Ms. M's home had become flea-infested and full of junk. Judge Eppes was well aware of Ms. M's mental decline, even to the point that he discontinued his overnight stays due to concerns that in her confusion she might shoot him by accident. His visits with Ms. M came to an end in October 1998 because her confusion was so great that she no longer recognized him. It was Judge Eppes' firm conviction that Ms. M was permanently and mentally incapacitated, and unable to understand legal documents. Judge Eppes finally observed that it was Dr. Gaddy, not Ms. M's family, who had a positive presence in her life.

Earl Wilkes, a former neighbor of Ms. M's, began noticing a decline in Ms. M's health in 1996. He recounted incidents where Ms. M lost her car, locked herself out of her house, and seemed confused. He said she often appeared dirty and failed to take care of her personal hygiene.

Rosemary Wade, one of Ms. M's caretakers from the fall of 1997 until March 1999, testified that Ms. M did not understand what she watched on television, could not remember trips or locations from which she had just returned, and could not even order meals from a restaurant menu. Wade witnessed Ms. M suffer from nighttime agitation and wander from the house at night. She added that Ms. M required assistance to handle basic activities of daily living, such as dressing herself, preparing meals, or bathing.

David Byrd, a private investigator and process server to whom Appellants had paid approximately $1,500 for investigative work, witnessed Ms. M's execution of the 1999 durable

---

loss was documented in 1993, Dr. Zamrini could only respond, "I was not aware of that."

power of attorney and revocation. Byrd first met Ms. M at attorney Truslow's office on March 12, 1999. Byrd admitted that at the time he had no knowledge of her Alzheimer's disease, dementia, or that Ms. M required constant care because of her dementia. Nevertheless, Byrd was willing to opine that Ms. M "understood the nature and effect of the action[s] she was taking" in signing the documents at Truslow's office.[10]

Ms. M's January 2002 deposition was also admitted. Ms. M claimed to pay her own bills and clean her own house, although she had done neither since at least 1996. She mistakenly claimed to drive her own car, as well as her tractor. Ms. M testified that she had no caretakers or aids, and that she was capable of taking care of herself, although she had continuous caretakers since 1996. She claimed she had no attorney, although Cameron B. Littlejohn, Jr., her attorney of record, was seated with her at the deposition. She could not name the President of the United States, Vice President of the United States, or the Governor of South Carolina. Ms. M failed several simple memory tests, including identifying three objects shown to her minutes before. She could not recall where she ate lunch that day. When asked if she may have revoked the 1988 power of attorney, Ms. M replied, "Good Lord, what do you expect me to remember something [sic] twelve years ago? I don't remember what happened yesterday."

The trial court issued its final order in May 2001. Having determined that Dr. Gaddy's witnesses were "particularly credible," he found, as do we, that "the medical testimony clearly indicates ... that [Ms. M] lacked mental capacity to understand or to execute any kind of legal documents in March 1999." He based his conclusion on evidence that she suffered from severe dementia caused by Alzheimer's disease, which he found progressively destroys brain cells, resulting in the progressive loss of cognitive functioning.

The trial court concluded that Ms. M lacked contractual and testamentary capacity "from March 12, 1999 and continuously

---

10. The trial court assigned little weight to Byrd's testimony, primarily as a result of his financial ties to Appellants. Our assessment of Byrd's testimony is the same.

thereafter." As a result, he invalidated the 1999 revocation of the 1988 durable power of attorney and the 1988 Will. He also invalidated the 1999 durable power of attorney, and declared valid the 1988 durable power of attorney. Finally, he awarded Dr. Gaddy litigation expenses to be paid from Ms. M's assets.

## DISCUSSION

Since 1986, the South Carolina Legislature has expressly authorized and sanctioned the use and efficacy of *durable* powers of attorneys.[11] S.C. General Assembly Act No. 539, § 1. Section 62-5-501 of the Code of Laws of South Carolina (Supp.2003) provides in part:

(A) Whenever a principal designates another his attorney in fact by a power of attorney in writing and the writing contains (1) the words "This power of attorney is not affected by physical disability or mental incompetence of the principal which renders the principal incapable of managing his own estate", ... or (3) similar words showing the intent of the principal that the authority conferred is exercisable notwithstanding his physical disability or mental incompetence or either physical disability or mental incompetence, the authority of the attorney in fact is exercisable by him as provided in the power on behalf of the principal notwithstanding later physical disability or mental incompetence of the principal ...

Upon the execution of a durable power of attorney, the attorney-in-fact retains authority to act on the principal's behalf notwithstanding the subsequent physical disability or mental incompetence of the principal. To honor this unmistakable legislative intent, it is incumbent on courts to uphold a durable power of attorney unless the principal retains contractual capacity to revoke the then existing durable power of attorney or to execute a new power of attorney. Otherwise, the very purpose of section 62-5-501 would be undermined.

---

11. "Durable" is a term of art signifying that a power of attorney survives the principal's disability. *See* 3 Am.Jur.2d Agency § 28 (1986).

**Contractual Capacity**

■ Appellants contend the trial court erred in finding Ms. M was incompetent to execute the 1999 durable power of attorney and revocation. We disagree, and find the evidence compellingly supports the findings of the trial court.

■ "[I]n order to execute or revoke a valid power of attorney, the principal must possess contractual capacity." *Thames,* 344 S.C. at 570, 544 S.E.2d at 857. Contractual capacity is generally defined as a person's ability to understand in a meaningful way, at the time the contract is executed, the nature, scope and effect of the contract. *In re Nightingale's Estate,* 182 S.C. 527, 541, 189 S.E. 890, 896 (1937). Where, as here, the mental condition of the principal is of a chronic nature, evidence of the principal's prior or subsequent condition is admissible as bearing upon his or her condition at the time the contract is executed. 53 Am.Jur.2d *Mentally Impaired Persons* § 157 (1996). In *McCollum v. Banks,* 213 S.C. 476, 483, 50 S.E.2d 199, 202 (1948), our supreme court held a testator's insanity, in order to invalidate a will, should be established at the time of execution, unless the insanity is "of a permanent or chronic nature." *See also In re Brazman's Will,* 172 S.C. 188, 194, 173 S.E. 623, 625 (1934) (stating if the evidence shows the insanity is chronic, it is presumed to continue).

Here, the credible medical and lay testimony presented compellingly indicates that Ms. M suffered from at least moderate to severe dementia caused by Alzheimer's Disease, a chronic and permanent organic disease, on March 12, 1999. We are firmly persuaded that Ms. M's dementia, chronic and progressive in nature, clearly rendered her incapable of possessing contractual capacity to revoke the 1988 durable power of attorney or execute the 1999 power of attorney. We find this conclusion inescapable based on the record before us.

Specifically, the evidence supplied by Doctors Carnes, Taylor and McClure established Ms. M's history of debilitating dementia dating back to 1996, as well as the progressive, chronic, organic, and irreversible nature of the disease. Although a patient suffering from such severe dementia may at times appear normal, they opined such a patient could not make rational decisions, understand the nature of his or her

actions, or handle their business or legal affairs. The credible lay testimony of Judge Eppes, Earl Wilkes, and Rosemary Wade provides forceful evidence corroborating the testimony of these three neurologists.

In contrast, the only expert medical testimony supporting Appellants' position that Ms. M possessed sufficient capacity to execute or revoke a power of attorney came from their two medical experts, Drs. Campbell and Zamrini. As noted, Dr. Campbell, an internist, when asked if she claimed "to have any expertise in the area of Alzheimer's disease or dementia," replied, "I don't." Dr. Zamrini's testimony is similarly lacking, primarily as a result of the false medical history provided to him by Appellants.

Based on our view of the evidence, we conclude that by at least March 12, 1999, and at all times thereafter, Ms. M lacked contractual capacity because she suffered from severe dementia caused by Alzheimer's disease, a chronic illness involving the irreversible degeneration of brain cells.[12]

**Testamentary Capacity**

■ Appellants assert the trial court erred in addressing Ms. M's testamentary capacity on March 12, 1999. We reluctantly agree, and vacate that portion of the trial court's order finding Ms. M lacked testamentary capacity on March 12, 1999.

Dr. Gaddy did not plead the issue of Ms. M's testamentary capacity. In his complaint, he sought relief from the attempted revocation of the 1988 power of attorney, not revocation of the 1988 Will. The trial court addressed the issue of testamentary capacity on its own volition because the revocations were contained in the same document, and because it believed the best use of judicial resources favored disposing of all issues in

---

12. We in no way suggest that all people suffering some degree of dementia, from Alzheimer's disease or otherwise, invariably lack contractual capacity. We hold that the subject of contractual capacity of one suffering dementia should be decided in a fact-driven, individualized manner. There may well be situations where an individual at the onset of Alzheimer's disease, or in the early stages of dementia, may retain sufficient capacity to contract. This, however, is not such a case, for Ms. M's capacity to contract had long since passed when her previously absent family members entered her life and attempted to gain control of her assets.

one action. We concur with the trial court's sentiment to achieve finality regarding testamentary capacity and to avoid further siphoning by Appellants of Ms. M's assets. Having failed, however, to plead the matter of testamentary capacity in the context of the purported revocation of the 1988 Will, we find it was error for the trial court to address and decide the issue, especially in light of Appellants' objection at the commencement of the trial to the trial court's consideration of the matter. We, therefore, vacate that portion of the circuit court judgment concerning the issue of testamentary capacity.[13]

**Necessary Party**

▮▮▮ Appellants argue the trial court's decision must be vacated due to the absence of a necessary party, Ms. M. We disagree.

We find Ms. M was adequately represented in this action because Dr. Gaddy brought this action as Ms. M's attorney-in-fact, and therefore, the action was brought on her behalf. "Whenever a[n] . . . incompetent person has a representative, such as a general guardian, committee, conservator or other like fiduciary, the representative· may sue or defend on behalf of the . . . incompetent person. . . ." Rule 17(c), SCRCP. Ms. M was incompetent prior to and at the time Dr. Gaddy brought this action. Therefore, under Rule 17(c), Ms. M was not required to be individually named as a party in this action.[14]

▮▮▮ We further note Appellants never raised this issue in the trial court.[15] Appellants, in an attempt to circumvent issue preservation rules, seek to recast the argument as one of subject matter jurisdiction by claiming that Ms. M is an

---

13. Having disposed of this issue on the ground of failure to plead, we do not address the jurisdictional question whether one's testamentary capacity may be determined prior to death.

14. From a legal and practical standpoint, it is beyond challenge (even from Appellants' view of the evidence) that Ms. M was incompetent when the case was tried. That undeniable fact essentially renders this issue moot, for Ms. M was either represented by Dr. Gaddy pursuant to the 1988 power of attorney or by Appellants pursuant to the 1999 power of attorney.

15. At trial, Appellants only objected to the inclusion of the word "purported" in the caption when listing their names as Ms. M's attorneys-in-fact.

indispensable party under Rule 19, SCRCP. Ms. M's incompetence involves her "capacity to sue or be sued" as the real party in interest which invokes Rule 17. "Rule 17 . . . clearly indicates the question of real party in interest does not involve subject matter jurisdiction." *Bardoon Properties, NV v. Eidolon Corp.,* 326 S.C. 166, 170, 485 S.E.2d 371, 373 (1997).[16] We conclude the issue is not preserved for our review. *See* Toal, Vafai, and Muckenfuss, *Appellate Practice in South Carolina* at 63 (2d Ed.2002) (citing *Tupper v. Dorchester County,* 326 S.C. 318, 487 S.E.2d 187 (1997) for the proposition that issue preservation requires "that the objection in the trial court must have been made by the party who raises the issue in the appellate court.").

**Litigation Expenses**

██ Appellants claim the trial court erred in authorizing Dr. Gaddy to reimburse his litigation expenses from Ms. M's assets. We affirm in result.

The 1988 power of attorney specifically authorizes Dr. Gaddy to "institute, prosecute . . . or otherwise engage in litigation involving me, my property or any interests of mine; . . . to employ . . . attorneys-at-law . . . for the proper administration of my property . . . to pay and adjust debts incurred by me or by my attorney-in-fact in connection with any power authorized hereunder." Because we find Dr. Gaddy was acting on behalf of Ms. M as her attorney-in-fact when he instituted this action, the language of the 1988 power of attorney, which provides for payment of such litigation expenses, controls. Therefore, we affirm the trial court's award of litigation expenses to Dr. Gaddy based on the language in the 1988 power of attorney. *See I'On, L.L.C. v. Town of Mt. Pleasant,* 338 S.C. 406, 417, 526 S.E.2d 716, 722 (2000) (stating that the appellate court may affirm for any reason appearing in the record). We reiterate that Dr. Gaddy was acting appropriately and within his fiduciary capacity in bringing this action.[17]

---

**16.** For a more thorough discussion on the *lack* of a relationship between a party's status as a real party in interest and subject matter jurisdiction, see *Bardoon Properties, NV v. Eidolon Corp.,* supra.

**17.** We find it extremely troubling that by May 2001, Appellants had paid from Ms. M's funds approximately $160,000 for attorney fees and

**Propriety of Judge Hughston Serving as Trial Judge**

 Appellants argue that Judge Hughston lacked jurisdiction and impartiality. These contentions, asserted for the first time on appeal, are utterly specious. In light of the serious nature of these allegations, we elect to review the procedural history.

Judge Hughston was assigned by South Carolina's Chief Justice, through the Office of Court Administration, to a common pleas nonjury term in the sixth judicial circuit in October 1999. During that term of court, pending motions in this case came before Judge Hughston, one of which was a motion to designate the case as complex. Judge Hughston recognized that designation of a case as complex is generally a function of the chief administrative judge for the circuit. It was observed, however, that the resident circuit judges of the sixth circuit, including the then current administrative judge, were disqualified due to conflicts. Consequently, at the request of the parties, Judge Hughston agreed to resolve the motions, handle pretrial matters and preside over the trial.

The trial commenced on February 19, 2001. Judge Hughston was assigned by the Chief Justice to preside over the February 19 term of court. Following four days of testimony, Judge Hughston took the matter under advisement and issued his final order on May 2, 2001.

From Judge Hughston's initial involvement in this case in October of 1999 through the issuance of the final order, the record contains not the slightest hint of a challenge to Judge Hughston's authority or impartiality. Moreover, Appellants filed a motion to alter the judgment on May 18, 2001, containing forty-six grounds of error, none of which is directed against Judge Hughston's authority or impartiality. In sum, at the trial level, Appellants *never* took exception to either Judge Hughston's involvement in or handling of this case.

---

costs they incurred. Appellants did so without court authorization, as they apparently believed they could do so unilaterally under the language of the 1999 power of attorney. Incredibly, Appellants criticize Dr. Gaddy for incurring approximately $90,000 in legal fees, while they make no mention of their unapologetic invasion into Ms. M's funds to pay their legal fees.

On appeal, we hear for the first time that Judge Hughston was an "advocate in these proceedings," and that his involvement "affected his ability to impartially try the case." The simple response is that this court will not address matters not raised and ruled upon in the trial court. *Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) ("It is axiomatic that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review."). In an effort to circumvent the issue preservation rule, a fundamental principle of appellate procedure with which Appellants are familiar, we are once again confronted with a subject matter jurisdiction claim. We reject this desperate, eleventh-hour attack on Judge Hughston and the assertion that he lacked jurisdiction to preside over this case. His authority to render judgment is beyond question, and if Appellants desired his recusal, they should have done so in a proper and timely manner. *See Parker v. Shecut*, 340 S.C. 460, 496–97, 531 S.E.2d 546, 566 (Ct.App.2000) (holding the issue of recusal of the trial judge, to be preserved for appellate review, must be raised in the trial court).

### Lifting of the Automatic Stay

On October 10, 2001, a panel of this court enforced an automatic stay of the trial court's order, and "revived" the March 12, 1999 revocation of the 1998 durable power of attorney, as well as the 1999 power of attorney naming Appellants as Ms. M's attorneys-in-fact. With our decision today, we immediately lift the automatic stay as provided in the October 10, 2001 order and Rule 225, SCACR. Dr. Gaddy shall immediately resume his responsibilities as the legal, duly authorized attorney-in-fact for Ms. M. Appellants George G. Douglass, III, and William P. Sherrod are hereby enjoined from conducting any business on behalf of Ms. M. Additionally, Appellants George G. Douglass, III, and William P. Sherrod shall within five days of receipt hereof deliver to Dr. Gaddy, through counsel, all documents pertaining to Ms. M, including all financial records, and as provided in the decree of the trial court's final order of May 2, 2001.

## CONCLUSION

The very idea of a durable power of attorney is to protect the principal should he or she become incapacitated. This case is precisely the type of situation for which the durable power of attorney is intended. On March 12, 1999, Ms. M, due to her chronic and severe dementia, lacked capacity to revoke the 1988 durable power of attorney and execute the 1999 power of attorney, and the evidence in this regard is overwhelming. In so holding, we return to Dr. Gaddy his fiduciary obligations to Ms. M, which he faithfully discharged prior to Appellants' regrettable involvement. The decision of the trial court is

AFFIRMED IN PART AND VACATED IN PART.

HEARN, C.J., and HOWARD, J., concur.