692 S.E.2d 549

**Michelle J. HAIRSTON, Appellant,**

v.

**Kathleen McMILLAN, Individually and as Personal Representative of the Estate of Normall O. Hudson, Deceased, Respondent.**

**In re Estate of Normall O. Hudson, Deceased.**

No. 4657.

Court of Appeals of South Carolina.

Heard Feb. 2, 2010.

Decided March 15, 2010.

James Thomas Young and John C. Thomas, both of Conway, for Appellant.

Jeffrey E. Johnson and Jarrod M. McPherson, both of Conway, for Respondent.

KONDUROS, J.

Michelle Hairston challenged the validity of her uncle's February 2006 will (the Will) on the grounds he was without testamentary capacity to execute the Will and the Will was the product of undue influence. The special referee found the Will to be valid. Hairston appealed. We affirm.

## FACTS

Normall O. Hudson (Decedent) was released from the hospital into home hospice care on Friday, February 24, 2006. At that time, his niece, Michelle Hairston, and her father, Olin Parker, were in town to check on Decedent's condition. Decedent's companion, Kathleen McMillan, and her daughter, Nancy McMillan (Cookie), a health-care worker, were with him. McMillan and Cookie were primarily responsible, along with hospice, for Decedent's care. Hairston and Parker left town on Friday to return home. On Sunday, Cookie telephoned Kathleen Dingle, an attorney, regarding changes to Decedent's will. Dingle testified she spoke to Decedent on the phone, and he indicated he wanted to change his will, making McMillan the sole beneficiary; it had been on his mind.

Dingle went to Decedent's home on Monday and her office assistant accompanied her to serve as witness. Dingle testified Decedent recognized her and was glad to see her. She further testified she asked Cookie and McMillan to leave while they discussed the will, and they went to the garage. According to the notes she dictated at that time, Dingle stated:

> I went through with [Decedent] what his old will said, and he told me he wanted to change it after we went through the provisions of it. He told me he wanted to leave everything to Kathleen McMillan. He said it was his decision and his decision only.... He knew his address. He knew how long his wife, Lucy[,] had been deceased. He knew who his family members were. He was able to tell me who Olin and Michelle are.... I was comfortable with the fact that he knew what he was doing and that he wanted to do it.

The Will effectively revoked Decedent's 2001 will, which left everything to his nieces and nephews. Dingle also prepared that will.

Deposition testimony of Decedent's sister-in-law, Patsy Hudson, revealed she visited him on Sunday. She indicated he seemed lucid, had eaten a small breakfast, and read and understood the newspaper, particularly commenting on the death of actor Don Knotts.

McMillan testified Decedent seemed improved in the few days prior to his death. She admitted to giving him a glass of

wine at his request on Friday.[1] She stated she was unaware of Decedent's desire to change his will and he requested Cookie call the attorney. She theorized he may have wanted to leave her assets to help her avoid going into a nursing home as they had discussed their mutual desires to avoid that in the past.

Cookie testified Decedent seemed to improve after his release from the hospital, eating a bit and having conversations. She also testified she did not administer some of the medications issued to him because they were to be administered on an as-needed basis and he did not need them until Monday night. Decedent died on Tuesday.

Dr. William Joel Meggs testified on behalf of Hairston as an expert in toxicology and internal medicine. He reviewed Decedent's medical records from his hospitalization and return home and opined that in his medical opinion, Decedent would not have had the capacity to make a will on February 27, 2006. His opinion was based on the maladies from which Decedent was suffering, which included renal failure, congestive heart failure, cirrhosis of the liver, atherosclerotic heart disease, and cerebral edema. Dr. Meggs further indicated the medicine prescribed for Decedent would have left him susceptible to undue influence, but no records were provided on how that medicine was administered upon his return home. Dr. Meggs also considered Decedent's mental status assessments. On February 24, he was confused with some speech and oriented to person, but not place or time. On February 27, when the will was executed, a social worker reported Decedent was confused when he attempted to provide a life history.[2] The following day of his death, his status was unresponsive.

Hairston testified she was not allowed to talk to Decedent on the telephone from the time she left him on Friday until his death. She also reported McMillan told her upon Decedent's death that she did not need to come; Decedent had left her [McMillan] everything and she was not needed. Hairston

---

1. According to Hairston, Decedent frequently drank wine and having wine in the house was not unusual.

2. This report also states this was the first day Decedent had exhibited confusion and McMillan and Cookie were attentive and caring.

filed a petition contesting the Will. The special referee found the Will to be valid, and this appeal followed.

## LAW/ANALYSIS

■ An action to contest a will is an action at law, and in such cases reviewing courts will not disturb the probate court's findings of fact unless a review of the record discloses no evidence to support them. *In re Estate of Anderson,* 381 S.C. 568, 573, 674 S.E.2d 176, 179 (Ct.App.2009); *Golini v. Bolton,* 326 S.C. 333, 338–39, 482 S.E.2d 784, 787 (Ct.App. 1997).

### I. Testamentary Capacity

Hairston contends the special referee erred in finding the Will valid in light of Dr. Meggs's testimony Decedent would not have possessed testamentary capacity at the time of the Will's execution. We disagree.

■ "[T]he party alleging incompetence bears the burden of proving incapacity at the time of the transaction by a preponderance of the evidence." *In re Thames,* 344 S.C. 564, 572, 544 S.E.2d 854, 858 (Ct.App.2001). The test of whether a testator had the capacity to make a will is whether he knew (1) his estate, (2) the objects of his affections, and (3) to whom he wished to give his property. *In re Estate of Weeks,* 329 S.C. 251, 263, 495 S.E.2d 454, 461 (Ct.App.1997). "[T]he legal test for determining whether or not a person has sufficient mental capacity to dispose of his property by will does not include the proviso that he must have a reasonable basis on which to found his like or dislike of the natural objects of his bounty." *Id.* "Further, the capacity to know or understand, rather than the actual knowledge or understanding, is sufficient." *Id.*

■■ The degree of capacity necessary to execute a will is less than that needed to execute a contract. *Id.* at 264, 495 S.E.2d at 461. "[E]ven an insane person may execute a will if it is done during a sane interval. . . ." *Id.* In order to invalidate a will, a testator's insanity should be established at the time of execution, unless the insanity is of a permanent or chronic nature. *Gaddy v. Douglass,* 359 S.C. 329, 345, 597 S.E.2d 12, 21 (Ct.App.2004).

██ "A person may execute a valid will, even if he or she is not competent to transact ordinary, everyday affairs." *Speegle v. Oswald,* 774 So.2d 595, 597 (Ala.Civ.App.2000). "Ability to transact important business, or even ordinary business, is not the legal standard of testamentary capacity, though it seems to be quite generally but mistakenly supposed, outside the ranks of the legal profession, that a capacity to transact important business is the criterion of fitness to make a valid will." *In re Nelson's Estate,* 227 Cal.App.2d 42, 38 Cal.Rptr. 459, 466–67 (1964).

██ Dr. Meggs testified Decedent was not competent at the time of executing the Will. However, he was not able to examine Decedent personally, but relied on medical records showing Decedent was experiencing some confusion and had been prescribed pain medication. In contrast, Dingle testified at the time of the execution of the Will, Decedent understood the extent of his estate, the potential beneficiaries of his estate, and what he was doing in changing his will. He also recognized Dingle and was able to converse with her in a lucid fashion. Furthermore, the deposition of Hudson reveals Decedent was lucid on Sunday, the date he first spoke with Dingle, ate a small breakfast and read the newspaper. Based on our standard of review, and bearing in mind the somewhat limited requirements for testamentary capacity, evidence in the record supports the special referee's finding Decedent was competent to execute the Will.

## II. Undue Influence

Hairston next argues the special referee erred in finding the Will valid because she presented evidence McMillan and Cookie exerted undue influence on Decedent to make the Will. We disagree.

██ "The mere existence of influence is not enough to void a will as all influences are not unlawful. For influence to vitiate a will, it must destroy free agency and amount to force and coercion." *Hembree v. Estate of Hembree,* 311 S.C. 192, 196, 428 S.E.2d 3, 5 (Ct.App.1993). "Circumstances must unmistakably and convincingly point to the substitution of another's will for that of the testator." *Id.* Evidence of undue influence may include "threats, force, restricted visitation, or

an existing fiduciary relationship at the time of or before the will's execution." *Id.* "A contestant must show that the influence was brought directly to bear upon the testamentary act." *Mock v. Dowling,* 266 S.C. 274, 277, 222 S.E.2d 773, 774 (1976). "General influence is not enough." *Id.*

The existence of a fiduciary relationship between a testator and beneficiary raises a presumption of undue influence. *Howard v. Nasser,* 364 S.C. 279, 288, 613 S.E.2d 64, 68–69 (Ct.App.2005). If evidence of such a relationship is presented, the proponents of the will must offer rebuttal evidence. *Id.* "We emphasize that although the proponents of the will must present evidence in rebuttal, they do not have to affirmatively disprove the existence of undue influence. Instead, the contestants of the will still retain the ultimate burden of proof to invalidate the will." *Id.*

In the instant case, the record shows McMillan and Hairston both held powers of attorney for Decedent. This establishes a fiduciary relationship between McMillan and Decedent and raises the presumption of undue influence. However, other evidence in the record supports the special referee's finding no undue influence occurred. Decedent apparently expressed no concern for being left in the care of McMillan and Cookie, and he was happy to be home from the hospital. While he did not speak to Hairston in the days leading up to his death, he was seen by hospice workers, neighbors, and other relatives with whom he could have shared any concerns. At the time of the execution of the Will, Dingle asked McMillan and her daughter to be out of the house, providing Decedent a chance to confide in Dingle if he did not wish to change the Will. Furthermore, Dingle testified Decedent told her on the phone changing his will had been on his mind. Accordingly, we find McMillan presented evidence to rebut the presumption of undue influence.

Furthermore, Hairston presented no evidence of threats or force wielded against Decedent. Although Decedent did not speak to Hairston in the days immediately preceding his death, his visitation and communication were apparently not restricted overall. Additionally, Hairston contends Cookie

and McMillan exerted control over Decedent's food and medicine and intimates they could have withheld it, giving them control over him. However, the record contains evidence to the contrary. Cookie, McMillan, and Patsy Hudson testified to Decedent eating better and more in the last days of his life. The prescriptions for Decedent were written for his comfort as needed, which supports Cookie's testimony regarding how she administered the medications. Consequently, evidence in the record supports the special referee's finding of no undue influence.

### III.  Viewing of Evidence

Finally, Hairston argues the special referee failed to view the evidence in the light most favorable to her as the contestant to the Will. We disagree.

While we acknowledge the special referee should have viewed the evidence in this fashion, Hairston's only argument is that the order did not contain a statement indicating the evidence was so considered. *Calhoun v. Calhoun*, 277 S.C. 527, 530, 290 S.E.2d 415, 417 (1982) (finding whether the contestants of a will met the required burden of proof must be determined by viewing evidence in the light most favorable to the contestants). Nothing in the record suggests the special referee did not view the evidence properly and the lack of an affirmative statement to that effect is not enough to warrant a reversal in light of the evidence in the record.

### CONCLUSION

Based on the record before us, we cannot conclude the special referee erred in finding the Will valid. Accordingly, the decision of the special referee is

**AFFIRMED.**

HUFF and THOMAS, JJ., concur.