**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
In The Court of Appeals

Elizabeth J. Langley, Appellant,

v.

Wendy J. Lynch, Rebecca M. Lynch, James M. Lynch, II, Donald Jordan, III, Jimmy White and S. Porter Stewart, II, as Personal Representative of the Estate of James M. Lynch, Defendants,

Of whom Wendy J. Lynch is the Respondent.

Appellate Case No. 2015-001941

————————

Appeal From Florence County
D. Craig Brown, Circuit Court Judge

————————

Unpublished Opinion No. 2017-UP-226
Heard March 9, 2017 – Filed May 24, 2017

————————

**AFFIRMED**

————————

Jon Rene Josey, of Turner Padget Graham & Laney, PA, of Florence, for Appellant.

Joseph M. McCulloch, Jr. and Kathy R. Schillaci, both of McCulloch and Schillaci, of Columbia, for Respondent.

————————

**PER CURIAM:**  Elizabeth Langley appeals the circuit court's grant of summary judgment to Wendy Lynch, arguing she presented sufficient evidence to create a genuine issue of material fact regarding (1) the capacity of James Lynch (Testator) to make a will and (2) whether Testator's will was the product of undue influence. We affirm.

## FACTS

Testator served as a magistrate judge in Florence County for over twenty years.  He had four children—Elizabeth, Wendy Lynch, Rebecca White, and James Lynch, II.  In mid-April 2012, Testator was diagnosed with brain cancer.  Around the time of his diagnosis, Testator split time living in his house and his female friend's house.  On May 11, 2012, Testator executed a will.  Testator continued to serve as a magistrate judge until he resigned in June 2012.  In early fall 2012, Testator lived exclusively in his own home and Wendy moved into his home in November to help take care of him.  Testator passed away on February 9, 2013.

Elizabeth subsequently initiated a will contest on the basis of lack of capacity and undue influence.  Wendy filed a motion for summary judgment and included affidavits from the drafting attorney, an ascribing witness, treating physicians, and family and friends.

In his affidavit, Fredrick Hoefer, a longtime attorney and friend of Testator, stated that Testator's clerk of court requested that Hoefer draft a temporary power of attorney and a healthcare power of attorney on behalf of Testator.  Hoefer drafted the documents and met Testator at Testator's office on April 18, 2012.  At that meeting, Testator executed the documents, requested Hoefer draft his will, and gave Hoefer a handwritten list of assets.  At the will's execution, Hoefer stated he and Testator "discussed his bequests . . . and the reason for not including his son . . . by way of specific bequest."  Hoefer explained that because of Testator's diagnosis, he wanted to be sure Testator was aware of everything in the will, and he "took substantially longer to talk with [Testator] than [he] would normally spend."  Hoefer believed Testator was "clearly of sound mind, was acutely aware of his mortality, his assets and, most importantly, his family."  Hoefer stated Elizabeth waited in the reception area while the will was executed and then drove Testator home.  Hoefer's paralegal, who served as a witness for the execution of Testator's will, stated, "At no time during [her] interaction with [Testator] that day did [she] observe anything that would lead [her] to question his mental competence or whether his actions were completely voluntary."

Wendy also submitted the affidavits of three of Testator's physicians who performed physical and mental examinations of Testator, after his diagnosis but before he executed the will, and found him competent. Testator was also examined on December 6, 2012, by a fourth physician who opined to a reasonable degree of medical certainty that Testator was competent to make important decisions. Additionally, on December 11, 2012, a fifth physician performed a competency evaluation on Testator and, again, Testator was found to be competent. Wendy also provided affidavits from numerous other friends, coworkers, and acquaintances of Testator who described Testator's competency and the lack of undue influence around the time the will was executed.

Elizabeth filed a memorandum in opposition to the motion for summary judgment along with the affidavits of witnesses that allegedly showed a change in Testator's capacity and Wendy's undue influence.[1]

Testator's daughter, Rebecca, alleged Testator "lacked the capacity to make a will" because certain anticipated portions of Testator's estate were not specifically addressed. Rebecca claimed that when Testator was diagnosed, there was a drastic change in his abilities. Rebecca stated Testator had memory issues and difficulty doing everyday tasks like dialing his cell phone. Donald Campbell, Testator's nephew, claimed that each time he visited Testator after his diagnosis, he "could tell that [Testator] was not the same." Campbell stated that when he visited with Testator post-diagnosis, Testator would act confused and was not as "sharp" as he used to be. George McClam, a friend and employee of Testator, claimed he visited Testator on May 9, 2012, two days before Testator executed his will. He asserted that during the visit, Testator said he signed some papers at the hospital, but Testator did not know what he had signed. McClam stated Testator said "he had to do something for [his son] as related to his living arrangements." He stated his conversation with Testator continued but "the train of thought was incoherent." During another visit around this date, McClam took Testator to the grocery store, but Testator was unable to make a purchase; McClam described, "[I]t was like he had entered a strange and unfamiliar place." He also stated that "one on one, in simple conversation . . . [Testator] seemed to function in a normal manner." Rae Wilkerson, Testator's friend, took a screenshot of her phone showing a text message

---

[1] Although the circuit court found the affidavits and other documents submitted by Elizabeth were untimely and in violation of Rule 56(c), SCRCP, "in consideration of the motion in the light most favorable to [Elizabeth], [it] considered the affidavits and other materials provided."

sent from Wendy to Wilkerson stating, "He [has] not been competent since his brain tumors dx [sic] due to damage seizure memory loss."

The affidavits submitted by Elizabeth also allegedly showed the undue influence Wendy exerted upon Testator. Rebecca believed Wendy "unduly influenced [Testator] in the creation of the will." Rebecca stated that after Testator's diagnosis, Wendy attempted to control Testator's actions and the individuals in his presence. Rebecca claimed Wendy told her that the siblings "needed to go ahead and divide everything because [Testator] was unable to do so." She asserted Wendy would not allow her to speak privately with Testator and "went so far as to have baby monitors in [Testator's] room." Rebecca stated Wendy's son moved into Testator's house to "police" Testator. Tracey Frazier, Testator's niece, claimed Wendy tried to control Testator. Specifically, she asserted Wendy (1) bombarded Testator with questions about his will and assets, (2) tried to keep Testator away from friends and family, and (3) repeatedly changed Testator's phone number. Frazier accused Wendy of trying to kill Testator on several occasions

Additionally, the affidavits submitted by Elizabeth allegedly showed Testator's will deviated from the intended distribution plan he expressed to his friends. Wilkerson claimed Testator said "he would leave everything split equally to his daughters." She stated Testator specified, "The lake house was supposed to be split three ways. [He] wanted [his] family to see each other at the lake house." Campbell claimed Testator confided that he planned to (1) leave his home to Wendy or Elizabeth and the lake house to the other one, (2) leave the Hill Street house to Rebecca, (3) set up a trust for his son, (4) leave $25,000 or $50,000 to his grandson, and (5) divide the rest of his estate evenly among his three daughters. Testator's will left real and personal property to each of his daughters. Testator specifically excluded his son over fear that any entitlements under the will would affect his son's ability to collect government benefits.[2]

Elizabeth also submitted the affidavits of Drs. Joseph Healy and Troy Gamble, and Testator's medical records from his May 2, 2012, Duke University Hospital visit. Dr. Healy explained records indicated Testator was alert and knew the day and date. He stated Testator "had problems with directions and . . . two step commands" and recalled Testator "typically did what was directed by people who were with him." Additionally, Dr. Healy opined that he did not believe Testator "had sufficient cognitive ability to understand the complexities of a will," and as a consequence,

---

[2] The record does not specify the type of benefits or any disability Testator's son suffered.

Testator "was not able to exercise a will on May 11, 2012." However, it is not apparent from Dr. Healy's affidavit when, or if, he treated Testator. Dr. Gamble did not treat Testator but stated that patients with frontal lobe disease should not be deemed competent to make good decisions despite appearing normal "without first being given a battery of complex mental and psychological testing." The medical records from Duke University Hospital indicated Testator was "alert[] and oriented" when treated on May 2, 2012, nine days before he executed his will. Specifically, the records noted Testator knew the date, could "name his three daughters," and successfully completed memory exercises. However, the records noted Testator was unable to walk heel-to-toe, had trouble counting backwards from one hundred in increments of seven, and was unable to spell words backwards.

On June 22, 2015, the circuit court granted Wendy's motion for summary judgment. The circuit court found Elizabeth failed to provide evidence to create a genuine issue of material fact as to Testator's capacity to make a will. The circuit court stated Drs. Healy and Gamble did not examine Testator for competency at the time the will was executed and, therefore, neither could offer an opinion to a reasonable degree of medical certainty as to Testator's competency at the time the will was made. As to undue influence, the circuit court found the affidavits and documents fell "far short of 'unmistakable and convincing' evidence and provide[d] only conclusory statements of opinion that [did] not raise a genuine issue of material fact." Furthermore, the circuit court noted Testator lived with a friend for several months after he executed his will, providing him an unhampered opportunity to revoke the will. This appeal followed.

## ISSUES ON APPEAL

I.    Did the circuit court err in granting summary judgment when it found that Elizabeth had not presented sufficient evidence of Testator's lack of capacity to create a genuine issue of material fact?

II.   Did the circuit court err in granting summary judgment when it found that Elizabeth had not presented sufficient evidence of undue influence to create a genuine issue of material fact?

## STANDARD OF REVIEW

"An appellate court reviews the granting of summary judgment under the same standard applied by the trial court under Rule 56, SCRCP." *Quail Hill, LLC v. Cty. of Richland*, 387 S.C. 223, 235, 692 S.E.2d 499, 505 (2010). "[I]n cases

applying the preponderance of the evidence burden of proof, the [nonmoving] party is only required to submit a . . . scintilla of evidence in order to withstand a motion for summary judgment." *Hancock v. Mid-South Mgmt. Co.*, 381 S.C. 326, 330, 673 S.E.2d 801, 803 (2009). "[I]n cases requiring a heightened burden of proof . . . the [nonmoving] party must submit more than a . . . scintilla of evidence to withstand a motion for summary judgment." *Id.* at 330–31, 673 S.E.2d at 803.

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Russell v. Wachovia Bank, N.A.*, 353 S.C. 208, 217, 578 S.E.2d 329, 334 (2003) (quoting Rule 56(c), SCRCP). Once the moving party meets this initial burden, the nonmoving party cannot simply rest on the allegations or denials contained in the pleadings. Rule 56(e), SCRCP. "[T]he nonmoving party must do more than 'simply show that there is a metaphysical doubt as to the material facts but must come forward with specific facts showing that there is a genuine issue for trial.'" *Grimsley v. S.C. Law Enf't Div.*, 415 S.C. 33, 42, 780 S.E.2d 897, 901 (2015) (quoting *Russell*, 353 S.C. at 220, 578 S.E.2d at 335). "Only disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"In determining whether any triable issue of fact exists, the evidence and all inferences [that] can *reasonably* be drawn therefrom must be viewed in the light most favorable to the nonmoving party." *Grimsley*, 415 S.C. at 40, 780 S.E.2d at 900 (quoting *Quail Hill, LLC*, 387 S.C. at 235, 692 S.E.2d at 505). Summary judgment may be granted when the evidence is capable of only one reasonable interpretation. *Bell v. Progressive Direct Ins. Co.*, 407 S.C. 565, 576, 757 S.E.2d 399, 404 (2014). However, summary judgment is a drastic remedy that "should be cautiously invoked so that no person will be improperly deprived of a trial of the disputed factual issues." *Baughman v. Am. Tel. & Tel. Co.*, 306 S.C. 101, 112, 410 S.E.2d 537, 543 (1991) (quoting *Watson v. S. Ry. Co.*, 420 F. Supp. 483, 486 (D.S.C. 1975)).

## LAW/ANALYSIS

### I. Testamentary Capacity

Elizabeth argues the circuit court erred in granting summary judgment because she presented sufficient evidence creating a genuine issue of material fact

regarding Testator's lack of capacity to make a will. More specifically, Elizabeth argues the evidence shows Testator (1) did not know all of his estate, (2) could not recall his son, and (3) was confused as to whom he wished to give his property. We disagree.

Additionally, Elizabeth argues that the text message sent by Wendy to Wilkerson—"[Testator has] not been competent since his brain tumors dx [sic] due to damage seizure memory loss"—shows Wendy has conceded Testator's incapacity. Again, we disagree because there is no indication of the date the text message was sent; therefore, we are unable to determine if the message pre-dates the execution of the will. Furthermore, even if we were to assume the text message pre-dates the will's execution, the text message is not sufficient to withstand summary judgment because, as discussed below, it does not show Testator lacked the capacity to execute a will.

Once "the formal execution of a will is admitted—or proved, a prima facie case in favor of the will is made out, and the burden is then on the contestants to prove undue influence, incapacity or other basis of invalidation." *Byrd v. Byrd*, 279 S.C. 425, 426–27, 308 S.E.2d 788, 789 (1983); *Howard v. Nasser*, 364 S.C. 279, 290, 613 S.E.2d 64, 69 (Ct. App. 2005) (noting a will is presumed valid when its formal execution goes unchallenged). The will contestants bear the burden of showing incapacity *at the time the will was executed*. *Hairston v. McMillan*, 387 S.C. 439, 445, 692 S.E.2d 549, 552 (Ct. App. 2010).

In order to survive summary judgment, the nonmoving party must provide evidence showing the testator lacks capacity. *See Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment."). A testator has the capacity to execute a will when he "knew [(1)] his estate, (2) the objects of his affections, and (3) to whom he wished to give his property." *Hellams v. Ross*, 268 S.C. 284, 288, 233 S.E.2d 98, 100 (1977). "The degree of capacity necessary for the execution of a will is less than that needed for the execution of a contract." *In re Estate of Weeks*, 329 S.C. 251, 264, 495 S.E.2d 454, 461 (Ct. App. 1997). "A person may execute a valid will[] even if he or she is not competent to transact ordinary, everyday affairs." *Hairston*, 387 S.C. at 446, 692 S.E.2d at 552 (quoting *Speegle v. Oswald*, 774 So. 2d 595, 597 (Ala. Civ. App. 2000)).

The test for capacity does not include the requirement that the testator "have a reasonable basis on which to found his likes or dislikes of the natural objects of his bounty." *In re Washington's Estate*, 212 S.C. 379, 387, 46 S.E.2d 287, 290 (1948).

"Further, the 'capacity to know or understand, rather than the actual knowledge or understanding, is sufficient.'" *Estate of Weeks*, 329 S.C. at 263, 495 S.E.2d at 461 (quoting 94 C.J.S. *Wills* § 15(c) (1956)). Moreover, the fact that a will is complex does not bear on the testator's capacity to execute the will. *Hembree v. Estate of Hembree*, 311 S.C. 192, 196, 428 S.E.2d 3, 5 (Ct. App. 1993) ("[T]he mere fact that the will was a complex document [that] required explanation from the drafting attorney does not convince us that the testator lacked the capacity to execute this document.").

Here, the formal execution of the will was not challenged, and therefore, a prima facie case for the will has been made. The burden, then, is on Elizabeth to provide a scintilla of evidence showing a genuine issue, rather than a metaphysical doubt, that Testator lacked capacity at the time the will was executed on May 11, 2012. *See Hancock*, 381 S.C. at 330, 673 S.E.2d at 803 ("[I]n cases applying the preponderance of the evidence burden of proof, the [nonmoving] party is only required to submit a . . . scintilla of evidence in order to withstand a motion for summary judgment."); *Hairston*, 387 S.C. at 445, 692 S.E.2d at 552 (requiring a will contestant to prove incapacity to make a will by a preponderance of the evidence); *see also Grimsley*, 415 S.C. at 42, 780 S.E.2d at 901 ("[T]he nonmoving party must do more than 'simply show that there is a metaphysical doubt as to the material facts but must come forward with specific facts showing that there is a genuine issue for trial.'" (quoting *Russell*, 353 S.C. at 220, 578 S.E.2d at 335)).

Elizabeth argues there is a scintilla of evidence that Testator "did not recognize or know all of his estate" because, as Rebecca's affidavit alleges, anticipated "portions of [Testator's] estate were not specifically referenced in his will." We disagree. The will specifically references multiple pieces of real property, mentioning location and acreage; and personal property, including vehicles, silver coins, and bank accounts. Further, the will has a residuary clause, which, in effect, provides for the disposition of the remainder of Testator's estate.

Elizabeth argues next that Testator did not know the objects of his affections because "he failed to recall his son as one of his children" during the examination at Duke University Hospital on May 2, 2012. Elizabeth infers that Testator failed to recall his son during the exam based on the statement in the report: "He can name his three daughters." We find the inference Elizabeth draws from this evidence is unreasonable, especially because the will specifically mentions Testator's son. Additionally, Hoefer stated that he and Testator discussed the reason why Testator chose not to bequeath anything to his son.

Finally, Elizabeth argues Testator did not know to whom he wished to give his property because Testator gave inconsistent accounts of how his estate was to be distributed. Wilkerson stated Testator expressed his wishes that his estate be divided equally among the three daughters and the lake house be shared by all three. Campbell stated Testator mentioned he was going to leave his residence to Elizabeth or Wendy and the lake house to the other one; set up a trust for his son; and leave the rest divided among the three daughters. The will leaves significant pieces of property to each daughter individually but leaves the lake house to Wendy; provides another list of assets to be split among the three daughters; omits any devises or bequests to the son; and leaves all residue to the three daughters evenly. We find there are not significant differences between the conversations Testator had with witnesses regarding the intended distribution of his estate and the actual distribution made in the will, so as to suggest Testator did not know to whom he wished to give his property. In fact, the varying distribution plans are quite similar and contain a consistent theme of equitable division of Testator's assets among his three daughters.

Although other evidence may show confusion, i.e., when McClam took Testator to the grocery store but Testator acted as if he had entered an unfamiliar place, this evidence has no bearing on whether Testator had capacity when he executed the will and is therefore insufficient to withstand summary judgment. *See Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment."); *Hellams*, 268 S.C. at 288, 233 S.E.2d at 100 (outlining the following elements for a testator's capacity to make a will: he "knew [(1)] his estate, (2) the objects of his affections, and (3) to whom he wished to give his property").

Additionally, we find the affidavits of Drs. Gamble and Healy are insufficient to withstand summary judgment. Similar to the reasoning above, Dr. Gamble's affidavit does not bear on whether Testator had the capacity to execute his will. The affidavit generally states that patients with frontal lobe disease should not be deemed competent "without first being given a battery of complex mental and psychological testing." In addition to the affidavit never mentioning Testator's capacity, we take issue with this statement because it is contrary to our well-settled law that capacity is presumed when a will is formally executed. *See* S.C. Code Ann. § 62-2-502 (Supp. 2016) (requiring a writing signed by the testator and two witnesses for a will to be considered formally executed); *Hellams*, 268 S.C. at 288, 233 S.E.2d at 100 ("It is the settled law of this state that when the formal execution of a will is admitted or proved, a prima facie case in favor of the will is made out, and . . . the burden is then on the contestants to prove . . . incapacity . . . ." (quoting *Havird v. Schissell*, 252 S.C. 404, 408–09, 166 S.E.2d 801, 803 (1969))).

Dr. Healy's affidavit is also insufficient.  Dr. Healy opined that he did not believe Testator "had sufficient cognitive ability to understand the complexities of a will," and as a consequence, Testator "was not able to exercise a will on May 11, 2012."  However, our law states that capacity does not depend on the complexity of a will.  *See, e.g.*, *Hembree*, 311 S.C. at 196, 428 S.E.2d at 5 ("[T]he mere fact that the will was a complex document [that] required explanation from the drafting attorney does not convince us that the testator lacked the capacity to execute this document.").  Because Dr. Healy's opinion of Testator's capacity is based on the inability to understand the complexities of a will, we find it is insufficient to withstand summary judgment.  Dr. Healy's affidavit at most could be construed as creating a metaphysical doubt as to Testator's capacity to make a will.  This, alone, does not warrant the case being decided by a jury.  *See Grimsley*, 415 S.C. at 42, 780 S.E.2d at 901 (admonishing the court of appeals for cherry-picking a single sentence from a single form, out of context, and elevating a metaphysical doubt into a genuine issue of material fact).

For the aforementioned reasons, we find the circuit court correctly granted summary judgment because there is no genuine issue of material fact regarding Testator's capacity to execute his will.

## II.    Undue Influence

Elizabeth argues the circuit court erred in granting summary judgment for Wendy because Elizabeth presented evidence creating a genuine issue of material fact as to undue influence.  Elizabeth argues the circuit court ignored the presumption of undue influence that arises upon the existence of a fiduciary relationship.  Elizabeth also claims evidence indicates Testator's contact with Elizabeth and others was cut-off or monitored.  We disagree.

"[I]n cases requiring a heightened burden of proof . . . the [nonmoving] party must submit more than a . . . scintilla of evidence to withstand a motion for summary judgment."  *Hancock*, 381 S.C. at 330–31, 673 S.E.2d at 803.  "Since the standard of proof in an undue influence case is unmistakable and convincing evidence, there must be more than a scintilla of evidence in order to defeat a motion for summary judgment."  *Russell*, 353 S.C. at 218, 578 S.E.2d at 334.

"The mere existence of influence is not enough to void a will as all influences are not unlawful.  For influence to vitiate a will, it must destroy free agency and amount to force and coercion."  *Hembree*, 311 S.C. at 196, 428 S.E.2d at 5 (citation

omitted). "Evidence of undue influence may include 'threats, force, restricted visitation, or an existing fiduciary relationship at the time of or before the will's execution.'" *Hairston*, 387 S.C. at 446–47, 692 S.E.2d at 553 (quoting *Hembree*, 311 S.C. at 196, 428 S.E.2d at 5). The influence exerted must be "brought directly to bear upon the testamentary act." *Mock v. Dowling*, 266 S.C. 274, 277, 222 S.E.2d 773, 774 (1976). "General influence is not enough." *Id.* Additionally, an unequal or unjust division of assets in a will alone is not sufficient to set aside the will for undue influence. *Smith v. Whetstone*, 209 S.C. 78, 90, 39 S.E.2d 127, 132 (1946).

Initially, Elizabeth's argument that there was a presumption of undue influence arising from the fiduciary relationship between Wendy and Testator is not preserved. Elizabeth did not raise this argument to the circuit court during the summary judgment hearing or in her motion for reconsideration. *See Elam v. S.C. Dep't of Transp.*, 362 S.C. 9, 23, 602 S.E.2d 772, 779–80 (2004) ("Issues and arguments are preserved for appellate review only when they are raised to and ruled on by the lower court.").

On the merits, we find Elizabeth has not shown more than a scintilla of evidence to survive summary judgment on her undue influence claim. The facts from cases in which undue influence has been found usually involve threats and a fiduciary becoming the primary beneficiary. *See Byrd*, 279 S.C. at 427–30, 308 S.E.2d at 789–91 (finding sufficient evidence of undue influence when the testator was physically and mentally infirm prior to and during execution of the will and the beneficiary threatened to send the testator to a nursing home and severely restricted visitation); *Moorer v. Bull*, 212 S.C. 146, 148–49, 46 S.E.2d 681, 681–82 (1948) (holding the issue of undue influence in a contested will case was properly submitted to the jury when there was evidence that the testator's son had a fiduciary relationship with her, she was in fear of her son, and the son indicated an intention to procure her estate for himself); *In re Estate of Cumbee*, 333 S.C. 664, 671–74, 511 S.E.2d 390, 393–95 (Ct. App. 1999) (finding undue influence when the beneficiaries used baby monitors to monitor the testator's conversations, the testator used hand signals to communicate with visitors because she felt uneasy talking around the monitors, and a beneficiary controlled the testator's finances and was fundamental in procuring a new will for the testator).

Elizabeth provided the affidavit of Rebecca, wherein Rebecca claimed Wendy controlled Testator, attempted to exclude him from visiting with friends and family, and constantly monitored him. However, Rebecca's affidavit does not rise to "more than a scintilla" because it does not indicate that Wendy's alleged control of Testator

occurred at or before Testator executed the will.  Additionally, Testator was living with his female friend for much of the time before he executed the will.

Moreover, we believe that even if Elizabeth provided evidence of influence, she has not presented evidence that the influence was brought directly to bear upon the making of Testator's will.  *See Mock*, 266 S.C. at 277, 222 S.E.2d at 774 (noting the influence exerted must be "brought directly to bear upon the testamentary act").  Elizabeth provided affidavits of witnesses with whom Testator spoke regarding how his estate was to be distributed.  Elizabeth argues this evidence shows that the disposition in the will is significantly different than Testator's intended distribution.  However, as discussed *supra*, we find there are not significant differences between the conversations Testator had with witnesses regarding the intended distribution of his estate and the actual distribution made in the will, so as to suggest any influence was brought directly to bear upon the making of Testator's will.  Even if the division of Testator's assets in his will was unequal, that fact alone is not sufficient to set aside his will on the basis of undue influence.  *See Whetstone*, 209 S.C. at 90, 39 S.E.2d at 132 ("The mere fact that the testator made an unequal, partial[,] or seemingly unjust division of his property is no ground for setting it aside.").

In conclusion, we find Elizabeth did not preserve her presumption-of-undue-influence argument and ultimately has not shown more than a scintilla of evidence to survive summary judgment on her undue influence claim.  Therefore, we find the circuit court properly granted summary judgment.

**AFFIRMED.**

**GEATHERS, MCDONALD, and HILL, JJ., concur.**